HAWKINS *v.* STATE.

No. 39721          May 16, 1955          80 So. 2d 1

*Gore & Gore,* Jackson, for appellant.

312

*Joe T. Patterson*, Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, Ross Hawkins, was indicted, tried and convicted at the regular October 1954 term of the Circuit Court of Smith County on a charge of murder in the killing of his wife, Mrs. Jessie Hawkins, and was sentenced by the court to suffer death by electrocution. From that judgment he prosecutes this appeal.

Two points are argued as grounds for reversal on this appeal: (1) That the court erred in overruling the de-

fendant's objections to certain testimony which it is contended was in no way related to the issue of the defendant's guilt or innocence of the crime charged in the indictment, but which tended to show that the appellant had committed other crimes; and (2) that the court erred in overruling the defendant's motion for a new trial on the ground that the admission of the evidence complained of resulted in the defendant being deprived of his constitutional right to a fair and impartial trial.

The record shows that the appellant was 59 years of age; and that he resided in the village of Polkville in Smith County, where he had lived practically all of his life; that the deceased, Mrs. Jessie Hawkins, was only a few years younger than her husband; and that the appellant and the deceased had been married and had lived together as husband and wife for a period of more than thirty years. The killing occurred on a county road about four miles northeast of the village of Polkville about midnight, on Sunday, August 22, 1954, while the appellant and his wife were returning to their home in a 1954 2-door Pontiac automobile after a two days' visit with relatives in the State of Louisiana. There were no eye witnesses to the killing. The State's evidence was entirely circumstantial. The defendant claimed that his wife's death resulted from an automobile accident, which was caused by a blowout in the right tire of his car.

Cletus Hamilton, who lived about one-half mile from the scene of the alleged accident, was the first person to arrive at the scene of the accident. Hamilton testified that he heard an automobile horn blowing about midnight. It sounded like a signal of distress. The horn was blown three times. He got in his car and drove down the road to find out what was wrong, and as he rounded a curve in the road after he had passed Troy Traxler's house he saw a light near the roadside and an automobile burning. The automobile was facing a large pine tree. He stopped his car, leaned his head out the window, and said: "What's happened?" A man whom he

recognized at once as the defendant, Ross Hawkins, appeared at the back end of his car and said to him, "I have had a wreck, and my car is burning up." Hamilton then drove his own car up by the side of the Hawkins' car and asked whether there was anyone in the car. The defendant said, "No, I drug Jessie out of the car." Hamilton then pulled his own car over next to a small bridge, and came back to the Hawkins car and asked the defendant where Mrs. Hawkins was. The defendant said, "Over there — over there in the bushes." Hamilton walked over to the place where the defendant's wife was lying, and called her two or three times. She made no answer. He felt her pulse. There was no pulse beating. Her hand was cold. He had no light, and he did not observe the wounds about her face. The defendant said to him, "I need an ambulance." Hamilton left to summons aid, and within a very short time other neighbors arrived at the scene of the accident. An ambulance arrived from the funeral home at Forest, and Mrs. Hawkins' body was taken to the funeral home. Lloyd Easterling carried the defendant to the hospital at Morton.

The body of the deceased was examined by Dr. J. W. Austin at the funeral home at Forest. It was found that there was a large hole in her head above the right eye; the right eye was pushed down; a part of the nose was crushed in; and there were burned areas in the region of the abdomen and above the right knee and on the upper right arm. The doctor testified that the injuries appeared to have been inflicted by a blunt object with hard force, or a very sharp object. There were no small scratches on the forehead or shivers of glass in the forehead, such as are usually found when a person has been cut by a windshield.

The defendant was examined at the hospital at Morton, and was then taken to a hospital in the City of Jackson. The examination made at the hospital in Jackson disclosed that the defendant had two superficial

wounds on his chest, one superficial wound on his right forearm and several scratches about the wounds. No suturing was required in the treatment of his injuries. The defendant complained of lower back pains, but the x-ray disclosed no fractures.

The sheriff arrived at the scene of the killing Monday morning about 9 o'clock. He was accompanied by one of his deputies, a member of the state Highway Patrol, and a deputy fire marshal. The sheriff testified that the accident occurred at the edge of a swamp. The road was a dirt road, and curved slightly to the left at the point where the appellant's automobile left the road, which was about 20 steps south of a slough bridge. The car was still smoking when the sheriff arrived at the scene of the accident. The left front tire was the only tire that had not blown out. The sheriff found a key to the automobile at the back end of the car resting on a piece of metal between the rear bumper and the trunk body. The key had apparently been used to open the trunk compartment. The front bumper of the car was in close proximity to but not touching a large pine tree. When the car was examined, it was found that it had been left in low gear when the fire started. The heat from the fire had melted the working mechanism, so that the gear could not be shifted. The tracks of the car indicated that the tires were still up after the car left the road.

The sheriff testified that he found a puddle of blood on the ground about six feet to the right of the car. There was no blood on the ground between the car and the puddle of blood, but there was a trail of blood from the puddle of blood over to the place where Mrs. Hawkins' body had been found during the night. Particles of brain were also found on the ground, and there was spattered blood on the leaves of the bushes as high as six feet from the ground. An icepick was found just across the fence to the right of the car. There was blood on the icepick. A whiskey bottle with a Louisiana stamp on

it and a whetrock were found in the edge of the woods to the left of the road. There was an odor of coal oil under the car. An iron rod wrapped with adhesive tape was found two days later in a hole of water in the creek about five hundred feet from the place where the car was found. There appeared to be blood on it and there was a coal oil odor about it. A coal oil jug with a small quantity of coal oil in it was found about 25 or 30 feet north of the hole of water. All of these articles, together with several articles of clothing, were sent to the Federal Bureau of Investigation, in Washington, D. C. for examination, chemical analyses and fingerprint study.

The sheriff testified that the defendant was arrested when he left the hospital three days after the alleged accident, and the sheriff talked to him about the alleged accident after his arrest. The sheriff stated that the defendant told him that he and his wife were returning from a visit with relatives in Louisiana at the time of the accident; that he had taken the dirt road several miles north of the place where the accident occurred for the purpose of driving by the home of his brother-in-law, Willie Traxler, to pick up his house key and five pounds of beef that he had requested Traxler to purchase for him before leaving on the trip to Louisiana; and that he was driving at a rate of speed of about 50 miles per hour, when the front tire of his car blew out and threw him into the pine tree. But the sheriff stated that there was no evidence to indicate that the car had been damaged to any considerable extent as a result of the impact with the pine tree; and there was no evidence of any damage done to the tree. The thick bark on the tree had not been disturbed. The only evidence of damage to the tree was a skinned place near the roots of the tree where the bumper of the car had come to rest after the tires had blown out as a result of the fire. No damage had been done to the instrument panel of the car. The steering wheel had not been bent.

Several other witnesses testified for the State concerning the condition of the car after the alleged wreck, the blood spots on the ground, the odor of kerosene in the soil underneath the front end of the car, and the finding of the icepick, the iron rod wrapped with adhesive tape, the jug containing a small quantity of coal oil, and other facts relating to the physical surroundings at the scene of the wreck the day after the wreck occurred.

The State also offered testimony to show that the defendant had purchased two accident insurance policies, providing accident insurance coverage for himself and his wife, with death benefits in the sum of $1,000 each, payable to the survivor, in the event either of them should die as a result of injuries sustained as a result of an automobile accident, and that the two policies were in force at the time of the death of Mrs. Hawkins.

Three special agents of the Federal Bureau of Investigation of Washington, D. C., testified as to the results of their examination of the articles sent to the Bureau by the sheriff for examination after he had completed his investigation of the killing. Peter G. Duncan, special agent assigned to the Serology Unit of the F. B. I. Laboratory, testified that the blood stains on the shirt sent to the F. B. I. Laboratory and the blood stains on the articles of clothing taken from Mrs. Hawkins came from a person belonging to the International Blood Group A. But it could not be determined whether the stain on the iron rod wrapped in adhesive tape was blood or not. The red stain on the icepick was human blood, but the amount of blood on the handle was not sufficient in quantity to enable the witness to make a grouping test so as to ascertain what blood group type the blood came from. J. William Magee, a chemist in the F. B. I. Laboratory, testified that the liquid extracted from the specimen of dirt taken from underneath the defendant's automobile had all the physical and chemical properties of kerosene and none of the physical or chemical properties of burned motor oil.

John R. Robyak, a fingerprint examiner of the F. B. I., testified that he was unable to get a readable or identifiable fingerprint from the glass jug, which had contained kerosene. The fingerprints found on the pint whiskey bottle were not the fingerprints of the defendant. But the witness testified that there was a positive identification of the palm print on the icepick which had been turned over to him for examination. Photographs had been made of the palm prints on the icepick with the aid of ultraviolet light, and these photographs had been compared with the palm print of the defendant. The witness stated that there were approximately 50 points of similarity between the palm print on the icepick and the palm print on the card bearing the name of the defendant, which had been sent to him by the sheriff. Twelve such points of similarity were usually regarded as conclusive.

The appellant's sister, Mrs. Willie Traxler, testified as the first witness for the defense. She stated that the defendant and his wife came by her home on Friday afternoon as they were leaving on their trip to Louisiana and left with her and her husband their house key so that her husband might go to their home and feed and water their chickens for them while they were gone. Mrs. Traxler also testified that the defendant requested her husband to purchase for him a beef steak from Luther Hales and keep it in the refrigerator for him until his return. The witness stated that her husband purchased the beef steak for the defendant and had it in the refrigerator the night Mrs. Hawkins was killed. Willie Traxler corroborated the statements made by his wife concerning the defendant's leaving the key with them Friday afternoon and the purchase of the beef steak for the defendant. Ravis Keene, who was Mrs. Hawkins' brother, testified that Lloyd Easterling awakened him about 1:15 on the night the accident occurred and told him that Ross had had a wreck and that Mrs. Hawkins had been killed. He and his wife went immediately to the Scott County Hos-

pital to see the defendant and ascertain the extent of his injuries. The witness stated that he had lived in the home with the defendant and his wife about two years at one time, that the defendant was good to his wife, and they appeared to be very affectionate.

Several other witnesses testified concerning minor details mentioned by the State's witnesses.

The defendant testified that he and his wife had lived together about 33 years and had lived in Smith County practically all of that time. They left their home Friday afternoon on a trip to Louisiana, where they expected to visit relatives during the week end. They drove to the home of Willie Traxler, his brother-in-law, and left the key to their house so that Willie Traxler could feed and water their chickens while they were gone; and the defendant requested his brother-in-law to purchase five pounds of beef for him from Luther Hales and keep it in the refrigerator until his return. The defendant and his wife then drove to the home of his wife's brother at Yuleton, Louisiana, and spent the night. They visited other relatives in Louisiana Saturday and Sunday, and left Bastrop about six o'clock Sunday evening on their return trip. They drove eastwardly on U. S. Highway No. 80, and reached Morton about 10:30 p. m. They stopped at a gasoline service station and had the gas tank refilled and purchased some sandwiches. They then drove southwardly toward Polkville and took a left hand road that came in by Willie Traxler's home, so they could pick up their house key.

The defendant stated that, when he and his wife were about a mile and a half from his brother-in-law's home, he had a blowout in the right front tire, and his automobile ran off the road and into a pine tree. When the car hit the pine tree, it rebounded. The defendant tried to stop and shifted the gear into second. The car moved forward again and hit the root of the pine tree or something else. One of his lights went out. He saw that his wife was hurt, and he got out of the car and

went around on the right hand side of the car and called to her; but she did not answer. He caught her under the arm and pulled her out of the car and laid her on the ground. He got a shirt out of the car and wiped the blood from her face, and tried to keep it out of her eyes. He then went back to the car and blew the horn and holloed several times trying to get help. The car caught on fire, and he moved his wife the second time to get her away from the fire. He threw a number of articles out of the car, including some clothes that he and his wife had in the car. He got his wife's purse out of the pocket of the car, and a flashlight and some wrenches. He was asked to explain how blood came to be in the bushes and the limbs of trees near the spot where his wife's body was found. He stated that the only way he could account for that was, that the shirt that he was using to wipe his wife's face was bloody and trash and dirt had accumulated on it, and he turned and flipped the shirt several times to get the trash and dirt off the shirt. He said, ''If it wasn't like that, I don't know.'' He stated that he did not hit his wife with an iron rod, ''No, Lord No. I loved my wife as well as any man loves his wife. Why in the world would I want to have done a thing of that kind for.''

The defendant was asked to state to the jury the facts about the insurance that he was carrying. He stated that he was carrying $16,000 liability insurance on himself, which was payable to his wife in the event of his death; that he had made a down payment of $1,250 on his car and had financed the unpaid balance of the purchase price through a finance company, and that he had insurance coverage on the car; and that he was carrying two hospital policies on himself and his wife, with death benefits in the sum of $1,000 each. He was asked about the car key that was found on the back end of his car. He stated that the car key found on the back end of the car was not the car key that he used. His wife had a car key and his daughter drove the car at times, and one

of them had probably dropped the key or left it in the trunk compartment of the car. He was asked about the icepick that was found near the fence. He stated that he did not know that there was an icepick in the car, and he could not account for the finding of the icepick near the scene of the accident. He knew nothing about the jug containing a small quantity of coal oil that was found near the water hole where the iron bar was found.

The defendant was subjected to a rigorous cross-examination by the district attorney, and was questioned at length concerning the amount of fire insurance that he had collected when the gasoline service station that he was operating in the Town of Forest during the early part of the year was damaged by fire. This testimony was objected to on the ground that the defendant was not charged with burning a filling station; but the objection to the testimony was overruled, and the defendant was required to answer the questions. The defendant then stated that he had collected $712 for the fire damage. He stated that his fixtures were not burned. He was then asked about other insurance that he had collected during his life. His attorneys objected to that line of questioning, but the objections were overruled, and the defendant was required to answer the questions.

The record shows the following questions and answers relating to the collection of other insurance: "Q. Mr. Hawkins, how much insurance have you collected in your life? Mr. Tullos: We object. The Court: Overruled. A. How much insurance? Q. You remember us figuring it up from your figures over in Jackson, how much insurance have you collected in your lifetime? You remember us figuring it up from your figures? A. I don't know. You had some figures. You all done the counting and figuring. Q. But you done the telling? A. You asked me about some. Q. And isn't it a fact that you told us over there what you collected added up to between 17 and 18 thousand dollars? A. I don't think, not that much. Q. How much did it add up to?

A. You all went back 25 years ago. Q. You have been collecting it for 25 years, haven't you? A. One time, from a railroad company. Q. What was that for? A. Getting hurt on the railroad. Q. How did you get hurt? A. I fell from the train. I slipped on a banana peel and fell. Q. That's right. A. Well, it's the truth, on top of the steps to the bottom. Q. And you have been collecting it ever since, haven't you? A. Oh, no, that's not true. Q. And you have collected, according to your own accounting, between 17 and 18 thousand dollars altogether? A. That's not my figures. That's you all's figures. You all done the figuring and counting. Q. You have got an insurance policy now, haven't you, on your grandson, that you are beneficiary in? Mr. Tullos: We object to that. The Court: Overruled. A. I have got a thousand dollar policy. Q. And you are beneficiary? A. I told them to make it to his daddy or mother, either one they wanted to, but they said, 'No, I will make it to you.' Q. How old is that grandson? A. He's about 3 years old. Q. You have a policy you took out and you are beneficiary in it. You took it out and paid the premiums. If that child were to die, you would collect? A. Yeah, she made me the beneficiary. It was done at the suggestion of the agent. Q. How much did you collect when your son was killed? Mr. Tullos: We object. The Court: Overruled. A. Well, let's see, I think about $10,000.00. Q. That was a little low. A. About $10,000.00, I think. Q. How old was he? A. He was about 19 years old. Q. Was he married or single? A. Single. Q. You have been collecting from the sick and accident company, you collected for about 2 years, didn't you? Mr. Tullos. We object. The Court: Overruled. A. I was sick. Q. Wasn't that for some kind of back injury? A. Not, it was stomach trouble. Q. Mostly stomach trouble, but some back trouble too, wasn't it? A. I had arthritis of the spine. Q. You collected for arthritis of the spine, just like Dr. Warner told you you had a slight condition? A. No, my back

hadn't bothered me for 2 years. Q. After collecting for 2 years, you got a cash settlement for $2,400.00 in one lump, didn't you? A. That's what they wanted. They asked for it. Q. And you had $2,000.00 insurance on your wife, where the only time you could collect would be when she died in a car wreck accidentally, didn't you? A. $2,000.00? Q. Yes, sir.''

The main point argued by the appellant's attorneys as ground for reversal on this appeal is that the court erred in permitting the district attorney to interrogate the defendant on his cross-examination about other insurance that he had collected during his lifetime and concerning the recovery of a judgment against the railroad company in a suit for damages for personal injuries more than twenty years before the date of the alleged homicide. Counsel for the appellant argues that the evidence in the case is entirely circumstantial, except that given by the defendant himself, and that, if the evidence relating to other alleged crimes, which were not shown to have been committed, but which it was plainly intimated had probably been committed, had been excluded, the remaining evidence would have been insufficient to warrant a conviction. Counsel also argues that the cross-examination was improper and highly prejudicial, in that there was a clear intimation from the cross-examination itself that the appellant had perpetrated a fraud on the railroad company when he obtained a judgment against the railroad company in 1931 for the sum of $1,200 on the pretense that he had been injured, that the appellant was probably responsible for the death of his son which enabled him to collect the $10,000 life insurance on the son; that the appellant had probably set on fire the gasoline filling station at Forest for the purpose of collecting the fire insurance, and that the appellant had procured a life insurance policy for $1,000 on his grandson for the purpose of killing him and collecting the proceeds of the policy.

■■ We think that the court erred in permitting the district attorney to interrogate the defendant concerning the collection of the proceeds of a life insurance policy on his son, who appears to have been killed in the State of Louisiana several years before the death of the defendant's wife, and the collection of disability benefits under a health and accident policy which the defendant had purchased for himself and on which he had paid the premiums, and the collection of fire insurance on the gasoline service station at Forest which had been damaged by fire during the early summer. The court also erred in permitting the district attorney to interrogate the defendant concerning the insurance policy on his 3-year old grandson, in which the appellant was named as beneficiary, and the suit against the railroad company for damages for personal injuries, which the defendant had prosecuted to a successful conclusion many years before the date of the alleged homicide. The evidence relating to all of these matters in our opinion was wholly irrelevant to the issue which the jury had to decide, and the admission of the testimony was extremely prejudicial to the accused.

■■ The general rule regarding the inadmissibility of proof of other crimes or offenses in the trial of criminal cases is stated in 20 Am. Jur., 287, Evidence, par. 309, as follows:

"A person, when placed upon trial for the commission of an offense against the criminal laws, is to be convicted, if at all, on evidence showing his guilt of the particular offense charged in the indictment against him. It is a well established common law rule that in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the

particular crime charged, unless the other offenses were connected with the offense for which he is on trial. In other words, it is not competent to prove that the defendant committed other crimes of a like nature for the purpose of showing that he would be likely to commit the crime charged in the indictment, for ordinarily such proof will not reflect any light upon the special crime with which the defendant stands charged.''

It is not to be inferred from the rule stated above that the admission of evidence which shows or tends to show the commission of an offense other than the particular one with which the accused is charged must be excluded in all cases and under all circumstances. There are, on the contrary, several well recognized exceptions to and limitations upon the general rule stated. Evidence of other crimes is always admissible when such evidence tends directly to establish the particular crime, and it is usually competent to prove the motive, the intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or the identity of the persons charged with the commission of the crime on trial. 20 Am. Jur., 289, Evidence, par. 310; King v. State, 66 Miss. 502, 6 So. 188; Story v. State, 68 Miss. 609, 9 So. 47; Webb v. State, 73 Miss. 456, 19 So. 238; Herman v. State, 75 Miss. 340, 22 So. 873; Raines v. State, 81 Miss. 489, 33 So. 19; Johnson v. State, 85 Miss. 572, 37 So. 926; Hurd v. State, 137 Miss. 178, 102 So. 293; Willoughby v. State, 154 Miss. 653, 122 So. 757; Floyd v. State, 166 Miss. 15, 148 So. 226.

The general rule as adopted by our own Court is that evidence of other crimes than the one for which the accused is being tried is inadmissible, and if it be doubtful whether such evidence falls within any of the exceptions to the rule, it should be excluded. King v. State, supra; Herman v. State, supra; Raines v. State, supra;

Dabney v. State, 82 Miss. 252, 33 So. 973; Willoughby v. State, supra; Collier v. State, 106 Miss. 613, 64 So. 373.

It is argued by the State's attorney that the evidence relating to the collection of insurance on the death of the appellant's son and the collection of fire insurance on the burned service station at Forest was competent for the purpose of establishing the appellant's motive for the crime charged against him in the indictment. It is said that the theory of the State in the prosecution of the charge of murder was that the appellant had killed his wife in a feigned automobile wreck for the purpose of collecting the death benefits provided for in the two accident insurance policies in force at the time of her death, under the terms of which death benefits were payable to the appellant only in the event his wife should be killed in an automobile accident, or as a result of a railroad, bus, streetcar, or airplane accident, and that the appellant had set fire to his car for the purpose of collecting the fire insurance on the car in excess of the amount due and owing to the finance company. And it is argued that the evidence complained of was admissible, not for the purpose of attempting to show the commission of other crimes, but for the purpose of proving motive and refuting the appellant's claim that his wife's death was due to accident, by showing that the appellant had been "collecting on insurance policies over a period of years as a result of strange and mysterious fires and deaths."

But the rule is that, where evidence which shows or tends to show the commission of other similar crimes is offered for the purpose of showing motive, such evidence should not be admitted, under any of the recognized exceptions, unless the proof of such other crimes is clear. 20 Am. Jur., 299, Evidence, par. 318. And in the case that we have here the State made no attempt to prove that such other crimes had been committed.

There is no evidence in the record to show that the fire which damaged the appellant's service station in the Town of Forest was of mysterious and incendiary origin, or that the appellant's son was killed under strange or mysterious circumstances. There is no evidence in the record that shows or tends to show that the appellant burned or was ever accused of burning the service station at Forest, or that shows or tends to show that the appellant had anything to do with the accidental death of his son, which occurred several years prior to the death of his wife. Nor is there any evidence in the record that shows or tends to show that the appellant perpetrated any fraud upon the railroad company in prosecuting to a successful conclusion a suit against the railroad company for damages for personal injuries during the early thirties.

**The fact that the appellant had collected the proceeds of a life insurance policy on the life of his son, in which he was named as beneficiary, or that he had collected fire insurance for a fire loss on his service station, was wholly irrelevant to the issue being tried,** unless it were shown that the collection of the insurance was a part of a criminal design to effect the death of his son and collect the life insurance or to burn the service station for the purpose of collecting the fire insurance. Yet no effort was made to prove that the collection of the insurance in either case was a part of any such criminal design, and the evidence relating to the collection of the insurance should have been excluded.

The proper administration of criminal justice demands that evidence tending to show the defendant's guilt of other crimes should not be admitted, even in a case that falls within one of the exceptions to the general rule stated above, unless such evidence is substantial. If the evidence of such other crimes only amounts to a suspicion, it should not be received. Underhill's Criminal Evidence, Third Edition, p. 199, par. 152.

In the case of Commonwealth v. Petrillo, 338 Pa. 65, the Court said: "If evidence of other crimes is to be admitted to support a charge of murder, such evidence, * * * must 'amount to proof' of that other crime and there must be 'ground to believe *that the crime charged grew out of it.*' Mere *suspicion* of the commission of another crime will not do; also, a relationship between the 'other crime' and the crime pleaded must be shown. By this standard must the admissibility of the evidence of the alleged other crimes above referred to be judged."

In Kahn v. State, 182 Ind. 1, 105 N. E. 385, the court held that in a prosecution for arson evidence that the defendant had another fire some years before was not admissible, without positive proof that the former fire had been set by the defendant. In Pelton v. State, 60 Tex. Crim. Rep. 412, 132 S. W. 480, the appellant had been indicted for forgery and the trial judge permitted proof to be made of other forgeries. The Court of Criminal Appeals held that "if the evidence only tends to show them to be forgeries, then they are not admissible against the defendant." In State v. Carter, 112 Iowa 15, 83 N. W. 715, the Court held that in a prosecution for obtaining money by false pretenses, evidence of other similar pretenses was not admissible to show intent, where there was no evidence to show that the other pretenses were false.

In the case of Haley v. State, 84 Tex. Crim. Rep. 629, 209 S. W. 675, 3 A. L. R. 779, the appellant was convicted of murder. The State's theory of the case was that the deceased had been assassinated. The evidence relied upon by the State was wholly circumstantial. As a motive for the homicide the State advanced the theory, supported by the testimony of the wife of the deceased, that she and the appellant had been criminally intimate, and that on the day preceding the homicide she had told the appellant that their intimacy must cease, and he had declared his determination to have her. During the trial

the court admitted evidence for the purpose of showing that, some ten months prior to the homicide in question, the appellant had killed his wife by administering poison to her. The Court of Criminal Appeals held that the admission of evidence of the other crime was error, and in its opinion said: "The circumstances, especially when taken in connection with the subsequent developments growing out of the present prosecution, surrounded the appellant with suspicion connecting him with the death of his wife; but to justify the admission of evidence of another crime, its commission must be proved, and if the State can do no more than to supply evidence casting suspicion upon the accused, the evidence should be rejected."

Considerable latitude should be allowed in the cross-examination of the accused. A defendant who takes the witness stand in his own behalf waives his constitutional privilege of silence, and the prosecution has the right to cross-examine him upon his evidence in chief as to the circumstances connected with the crime with the same latitude as would be exercised in the case of an ordinary witness. The accused does not, however, by offering himself as a witness in his own behalf, waive his right to object to improper cross-examination designed to elicit incompetent evidence, especially of an incriminating nature. Wharton's Criminal Evidence, Vol. 3, 2202, par. 1325.

The rule against the admissibility of evidence of other crimes is equally applicable whether the evidence is elicited from a witness for the prosecution or from the defendant himself. Wharton's Criminal Evidence, Vol. 1, 483, par. 343.

In the very recent case of Berry v. State, 212 Miss. 164, 54 So. 2d 222, the appellant had been convicted of murder and sentenced to imprisonment in the state penitentiary for the term of his natural life. The record showed that upon the trial of the case in the lower court the district attorney, on the cross-examination of the

appellant, over the objection of the appellant's attorney, had been permitted to show that the appellant in a conversation with the deputy sheriff had told the deputy sheriff that the pistol used by him in the homicide had been used in killing three other persons. This Court on appeal held that the testimony was entirely incompetent and irrelevant, and that it was prejudicial error for the trial judge to permit the evidence to go before the jury. The Court in its opinion said: "The plain inference which the jury was permitted to draw from it, and which they no doubt did draw from it, was that the appellant was a three-time killer, who cheaply regarded human life, and who boldly and callously boasted of his exploits with his revolver." And the Court held that the evidence was so highly prejudicial that it was unable to say that the jury was not affected by it.

██ ██ The evidence in this case, in our opinion, was sufficient to warrant the jury in returning a verdict of guilty as charged. ██ ██ And as stated by the Court in Books v. State, 209 Miss. 150, 46 So. 2d 94, "Only errors so grave as to deny the defendant the benefit of some fundamental right are considered where a jury, under the law and the evidence, could reach no other verdict than that of guilty." Wexler v. State, 167 Miss. 464, 142 So. 501; Wright v. State, 193 Miss. 119, 8 So. 2d 455. But this is not one of those cases for the application of the rule that a conviction will be affirmed unless it appears that another jury could reasonably reach a different verdict upon another trial. ██ ██ The errors complained of here affect the constitutional right of the accused to a fair and impartial trial. The defendant is entitled to another trial regardless of the fact that the evidence on the first trial may have warranted the verdict which the jury returned. Scarbrough v. State, 204 Miss. 487, 37 So. 2d 748.

For the reasons stated above the judgment of the lower court is reversed and the cause is remanded.
Reversed and remanded.
All justices concur, except *Lee, J.,* who took no part.