485 So.2d 681 (1985)
Othie Lee WEST
v.
STATE of Mississippi.
No. 55695.
Supreme Court of Mississippi.
December 4, 1985.
As Corrected on Denial of Rehearing April 16, 1986.
*682 Julie Ann Epps, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., and William S. Boyd, III, Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Justice, for the court:
Othie Lee West was convicted in the Circuit Court of the First Judicial District of Hinds County of capital murder and sentenced to death. A number of errors are assigned on appeal, which we will discuss.
Because of the prejudicial argument made by the prosecuting attorney in the guilt phase, we reverse.

FACTS
This homicide occurred on late Sunday afternoon, June 5, 1983, in Unit 11 of the Lincoln Garden Apartments in northwest Jackson. On that date Mary Ann Brim, age 54, had lived in Apartment 1103 on the first floor with her common law husband or companion, Theodore (Night Hawk) Lee, for over fifteen years.
Othie Lee West lived with his mother and nine-year-old brother, in Apartment 1106 on the second floor. West was born September 2, 1964, was illegitimate, and for most of his life his mother was on welfare. For a year or two prior to June 5, 1983, she held menial employment. West had graduated from the public schools.
On that afternoon Patrol Officer Charles Hedgepeth with the Jackson Police Department received a radio dispatch to investigate firing of shots in the Lincoln Garden Apartments. He arrived at approximately 7:30, two to three minutes after the call. When he got there he observed both an ambulance and the fire department were also on the scene.
Having determined from some source that the shots had come from Apartment 1103, Hedgepeth approached the apartment and just as he did, Lee walked to the door and was reaching to unlock the door with his keys when Hedgepeth asked him if he lived there. Lee opened the door and as Hedgepeth was entering he saw a naked woman lying on the floor. He shoved Lee back out of the apartment and went on inside. The woman was Mary Ann Brim, *683 and all she had on was a bloody shirt rolled up about her breast, and her breast was also bloody.
Just after he had shoved Lee back and went on into the apartment, Hedgepeth heard a loud noise from the back of the apartment. He shouted, "Police, freeze," and heard a cracking noise like glass breaking. He rushed into the back bedroom, saw no one, and also saw the window had been broken out. He went out the window, still seeing no one, ran around to the back of another building, and as he did so, some women and children yelled, "There he goes. There he goes."
Hedgepeth gave chase. The man he was following had on a light blue pullover shirt with a dark band around the sleeve, some grayish colored trousers, and a baseball-type cap. He lost sight of him momentarily, but a few seconds later caught sight of him.
The man Hedgepeth was chasing ran into a local bar called the "C.B. 40 Club." Hedgepeth went around the back to see if he could have gone on through the bar and out the back. In the back was a ten-foot-high chainlink fence with three strands of barbed wire on top. Hedgepeth returned to the front of the building, and his backup officer, Sgt. Freddie Weeks, who was the third man in the foot race, informed him that no one had come out the front.
The officers went inside the building which was darkened. Hedgepeth told the bartender to turn the lights on and turn off the juke box, which he did. A woman coming out of the kitchen indicated to Hedgepeth no one had gone through.
Hedgepeth saw West sitting at a table, breathing hard. He had a full beer and Hedgepeth said he was breathing too hard to drink. He arrested West.
Nearby the apartments some children were playing and congregated around a picnic table.
Gary Michael, fifteen years of age, had seen West about four o'clock in the afternoon by a pool. He saw West shove his way into Brim's apartment. About ten seconds after West went inside, Michael heard a shot, and then heard a woman scream. He testified he saw a gun in West's hands when he went into the apartment. Michael said West had the nickname of "Sexy Frog."
Levin Jones, age thirteen, first noticed West when Caprice Mangum told the children to look around, thereby directing their attention to the Brim apartment. He observed West and Brim arguing, and saw West leave and go upstairs to his apartment. Brim shut her door. West returned from his apartment, and walked around the building. When he came back around the building, Brim opened her door and looked out. It appeared to Jones she tried to shut the door in West's face. West shoved her inside, and after he did so, Jones said he heard a shot, then a scream, and then another shot. According to Jones the first shot was fired about three seconds after West went into the apartment.
Jones ran and hid until the police came. He then ran where he could see the back of Brim's apartment. While there he saw Sexy Frog come out the back window and run towards the school. He saw the two officers chasing him, and Jones followed them to the bar. He then saw the officers bringing West out handcuffed.
Jones called West "Sexy Frog." He said the officers arrived about three minutes after the shooting.
Caprice Mangum also saw West shove Brim into the apartment and heard a shot and then a scream. During her testimony, Mangum was not making a satisfactory witness, and the District Attorney asked her if she was afraid, and out of the presence of the jury asked her if West had threatened her. Mangum replied, "Yes."
When the jury returned, the district attorney asked her if she were still scared, and she replied, "No."
Steve Bulley, sixteen-years-old, saw Sexy Frog walking down the sidewalk "like he was coming from home." He saw Brim (whom he did not know) standing in her doorway with her screen door open, and *684 West outside on the concrete. He saw West push her and the door closed. About three seconds later he heard a shot, and then a scream. He ran and did not hear a second shot.
The crime scene was investigated by Officers Hedgepeth, Weeks and Louie Brooks, who was a crime scene investigator with the police department.
Brim had been shot once. The bullet entered just to the left of her right nipple, and was found in her body on autopsy. She had no sign of life when the officers arrived. The fire department team made no attempt at artificial resuscitation.
The apartment only had one door. Another shot was fired near the right side of Brim's head, making a hole in the floor, the spent bullet was recovered from the left side of Brim's body.
A revolver was on a nearby table in the same room.
The record does not disclose whether effort was ever made to take fingerprints from the revolver or from any place in the apartment, and there was no testimony linking West by fingerprint evidence.
Hedgepeth said the glass from the broken window was inside the room. Officer Weeks testified he saw somebody going through the window. There was no sign of blood around the broken window.
Officer Brooks got the bullet from the floor and the gun. He found a wet liquid beneath the pelvic area of Brim's body, which he soaked in paper swabs and delivered to the City Crime Laboratory. There was a broken pot by the window in the bedroom, which Lee said had been in the living room.
Brim's clothes were collected for examination. West's were also taken from him, and later, pursuant to a court order, blood, saliva, head and pubic hair samples were taken from him.
West showed no signs of having been cut in going through the window.
Deborah McNeely, a forensic serologist with the Jackson crime laboratory, found some signs of blood on West's right shoe and shirt, but was unable to identify the type. She testified the "rape pack," apparently the swabbed liquid taken by Officer Brooks, evidenced Brim "having recent sexual intercourse." The visual inspection for sperm was positive. Her examination of all samples taken from Brim and West was inconclusive in connecting West, however. She said West was a "nonsecretor". She could not detect any of his secretions from his saliva, blood or semen. She could neither positively include nor exclude West from the tests.
The pathologist, Dr. Rodrigo Galvez, said the bullet went from the right side of Brim's chest through her heart, her left lung, and lodged in the left side of her back, at the tenth intercostal space. The bullet was recovered from just beneath the skin.
Over defense objection, he testified Brim also had "defense wounds," describing them:
What happened [sic] when we are being assaulted or attacked by somebody else, we try to protect ourselves with our hands and she had two cuts; one in the right thumb and then one in the right middle finger.
He said the genitalia revealed a sticky, gluey liquid "like semen." He found no bruises in or around her genitalia.
He was of the opinion Brim lived five minutes after being shot, although he conceded studies have shown a person with this wound would die instantly. He did testify that immediately upon being shot she lost consciousness.
John Michael Allen, firearms specialist with the Mississippi Crime Laboratory, testified that while the two spent bullets bore the same characteristics as produced by the .38 revolver found there in the apartment, due to lack of reproducible individual characteristics, he could not be positive this weapon fired the bullets.
Following deliberations the jury convicted West of capital murder. The trial then proceeded to the sentencing phase and the *685 jury sentenced West to death. The relevant portions of the record dealing with instructions and argument to the jury will be set out when the points of law are discussed below.

LAW

SUFFICIENCY OF THE EVIDENCE
In challenging the sufficiency of the evidence, counsel for West argue that the evidence failed to established he sexually assaulted Brim. Live sperm were taken from the body, but they correctly point out sperm can live for several days. The state responds that under all the circumstances a jury issue was made that a puddle of liquid (although not determined to be semen) was found under the pelvic area of the corpse. No eyewitness testified to seeing Brim standing almost naked in the doorway, the condition in which her body was found clothed.
Counsel for West then argue that in order to constitute capital murder it was incumbent on the state to prove that the murder was committed while West was engaged in or committing a sexual battery. The eyewitnesses testified that almost immediately after West forced his entrance into Brim's apartment, a shot was fired, the bullet penetrated the heart, and therefore counsel argue that under Miss. Code Ann. § 41-36-3 Brim was most certainly dead since the sexual battery, if indeed any, occurred after she was shot. Section 41-36-3 states the following:
An individual who has sustained either (a) irreversible cessation of circulatory and respiratory functions or (b) irreversible cessation of all functions of the entire brain, including the brain stem, is dead.
The testimony of Dr. Galvez made this contention a jury issue. Fluid containing semen was inside the labia.
Counsel finally argue that some person other than West could have committed the murder.
In this case, as in many in which there is no eyewitness to a crime who testifies, there are many questions which will never be answered. The evidence is overwhelming, however, that West shot Brim. While the evidence that he sexually assaulted her while in the commission of murder is weak, we cannot say it was not a question for the jury.

PREJUDICIAL ERRORS DURING VOIR DIRE
Contrary to West's contention, there was no Witherspoon error committed in excluding prospective juror Dinkins for cause nor on any other excused juror. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
West then asserts that, assuming these prospective jurors were properly excluded under Witherspoon, by excusing all jurors who had conscientious scruples against the death penalty, only a conviction prone jury was left, not representative of a cross-section of the community. He cites Grigsby v. Mabry, 569 F. Supp. 1273 (E.D.Ark. 1983); affirmed 637 F.2d 525 (8th Cir.1980). This argument has been rejected by the United States Supreme Court and our 5th Circuit Court of Appeals. See: Sonnier v. Maggio, 720 F.2d 401 (5th Cir.1983); Smith v. Balkcom, 660 F.2d 573 (5th Cir.1981); Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978); Spencer v. Zant, 715 F.2d 1562 (11th Cir.1983); Woodard v. Hutchins, 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984).
West next complains of prejudicial questions asked by the district attorney during voir dire of the prospective jurors.
It would appear the state went beyond proper questions, delved too deeply, and asked questions which would be subject to misinterpretation or confusion. However, a voir dire examination of jurors must be discretionary with the circuit judge, and in the absence of objection we have no way of knowing the degree of influence it had, if any, on the ultimate verdict. West was represented by an experienced trial attorney. His capital murder experience is subject to question, but we *686 have no authority to reverse a case, on a discretionary matter with the trial court, in the absence of some palpable, obvious prejudicial error when an experienced trial lawyer sat there and never offered the first objection. See Booker v. State, 449 So.2d 209, 219 (Miss. 1984); Coleman v. State, 378 So.2d 640, 649 (Miss. 1979); and Murphy v. State, 246 So.2d 920, 922 (Miss. 1971). If we did, we might as well tell all attorneys they have no responsibility whatever: sit back, do not object, indeed encourage prosecutorial errors, and this Court will correct defense as well as prosecution mistakes.
While the district attorney gave attention to minutiae, and his voir dire appears overdone in certain respects, none of the questions were of a serious nature, and if trial counsel deemed them objectionable he should have stated his objection to the circuit judge.
Having made these observations, we also state that district attorneys would be well advised to keep their voir dire questions on well-trod, accepted paths. There was absolutely no need in this case to wander afield.
The prosecution and circuit judge should also avoid questions seeking a promise or commitment from the jury to convict if the state proves certain facts. This is error. See: Murphy v. State, 246 So.2d 920 (Miss. 1971), and cases cited. While the prosecution wandered astray, we cannot say there was a violation of the proscription of Murphy. Moreover, there was no objection.

NOT HEARSAY
West alleges that it was error to permit Officer Hedgepeth to testify that the woman coming out of the kitchen at the lounge indicated to him no one had gone through the kitchen. This was permissible, because the statement was of a contemporaneous fact, and not offered for the truth or falsity of the statement. See: Handshoe v. Daly, 211 Miss. 189, 51 So.2d 230 (1951); Lawler v. Skelton, 241 Miss. 274, 130 So.2d 565, 568 (Miss. 1961); Wilson v. State, 390 So.2d 575, 578 (Miss. 1980).

SEXY FROG
West had a nickname of "Sexy Frog," which came out during the course of the trial. There is no evidence in this case that the state vilified or abused West by this nickname, which could have come about in a perfectly harmless way. Indeed, defense counsel in closing argument noted his client had this nickname. Where a party or a witness has a nickname which trial counsel deems could possibly prejudice his case, he is under a duty to call it to the attention of the circuit judge prior to trial so that the witness may be instructed to refrain from its use. Even with such precautionary instructions, a nickname could surface in trial proceedings.

DEFENSE WOUNDS
Dr. Galvez characterized cuts on Brim's hands as having resulted from an attack, calling them "defense wounds." This testimony should have been excluded. An expert witness should not give opinions which can be reached by the average layman. See: Illinois Central Railroad Co. v. Williams, 242 Miss. 586, 135 So.2d 831, 839 (Miss. 1961).[1]

CLOSING ARGUMENT  GUILT PHASE
During closing argument the state opened with the following remarks:
BY MR. MAYFIELD:
If it please the Court, ladies and gentlemen of the Jury, not much more than twenty-four hours ago we stood up here before you to make our opening statements, during which each side was given the opportunity to tell you what we were gonna prove to you during this trial. I want you to think now about who did what they told you they were gonna do? You'll recall the Defense got up here and *687 told you that during the course of this trial they were gonna prove to you that Otha Lee West didn't commit this crime  and I wrote this down. They said, "We're gonna prove to you that he was not there. We're gonna prove this to you by numerous alibi witnesses, who will prove to you that he was somewhere else at that time."
BY MR. GORE:
Just a minute, please, sir. I object and move for a mistrial. He's commenting on the failure of the Defendant to testify or to put on any proof, which the Court has instructed the Jury he's not required to do.
BY THE COURT:
Motion denied.
[R. 444-445]
The state having made the above statement, defense counsel made the following remarks in closing argument:
BY MR. GORE:
... Now, we've taken the position that there are so many holes in this case, which I'm gonna discuss a little later, that we decided not to put Otha Lee on the stand or any of his witnesses. And I'm gonna refer you to Instruction No. D-6, which you'll read: "The Court instructs the Jury that you must not consider the fact that the Defendant did not testify as being evidence against him and no inference of any kind may be drawn from the fact that the Defendant did not testify in this case." Now, this, our position is, is trial strategy. We don't think we were put to the necessity of putting him on the stand.
[R. 460]
Thereafter in the final argument, the district attorney stated as follows:
BY MR. PETERS:
... And what do they say? We decided not to put the Defendant on the stand through trial strategy. What was their trial strategy? We [the state] put every witness we could find on the stand.
[R. 471]
He then proceeded to relate all the witnesses that they had put on the witness stand. Then the prosecution returned to West:
BY MR. PETERS:
... Everybody we could find. And what did they say? "We decided not to put the Defendant on the stand" 
BY MR. GORE:
If the Court please, we're gonna object. That's improper. He's commenting on his failure to testify or to call witnesses.
BY THE COURT:
Overruled.
BY MR. PETERS:
"We decided not to put the Defendant on the stand for trial strategy." Could any of you possibly have a doubt?
[R. 472]
It is the duty of the presiding judge, as well as trial attorneys on both sides, in the conduct of a criminal case to see that the constitutional rights of an accused are not violated. A defendant has a constitutional right not to take the witness stand. See: Mississippi Constitution, Article XXVI; U.S. Constitution, Amendment V; Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). This right becomes meaningless if comment or insinuation can be made reflecting upon his failure to testify. Indeed, for over a century, there has been a statute in effect in this state which provides:
§ 13-1-9. Competency of an accused.
The accused shall be a competent witness for himself in any prosecution for crime against him. The failure of the accused, in any case, to testify shall not however operate to his prejudice or be commented on by counsel. [Emphasis added]
As was stated in Brown v. State, 340 So.2d 718, 722 (1976), commenting on a defendant's failure to testify violates "an elementary and long established principle of law." See: Clark v. State, 260 So.2d 445 (Miss. 1972); Hines v. State, 339 So.2d 56 (Miss. 1976); Peterson v. State, 357 So.2d 113 *688 (Miss. 1978); and Wilson v. State, 433 So.2d 1142 (Miss. 1983).
Our forefathers vouchsafed the right of an accused to remain silent in his trial. Yet there is no way to remove the suspicion the defendant himself casts upon his own defense when he chooses not to take the witness stand. He may very well be the best, if indeed not the only person to answer the proof offered by the state. When he remains silent, no common sense juror can avoid the mental question to himself of why the defendant did not take the stand.
In this case the circuit judge was correct in denying West's motion for a mistrial following the remarks of the prosecuting attorney made in opening argument, although the prosecution did come perilously close to the borderline of prejudicial argument.
Defense counsel apparently thought he had no choice but to attempt to explain what he viewed as a comment by the state on his client's failure to testify in his own defense. Any attempt to remove this stigma, however, by "explanation" in closing argument will almost certainly call attention to and enlarge the suspicion, not remove it. And, the so-called "explanation" West's counsel no doubt met such fate.[2]
West's defense, having already received a mortal wound, the prosecution swiftly administered the coup de grace by ridiculing the "explanation" of defense counsel and concluding with the damning question: "Could any of you possibly have a doubt?"
West received no protection of his constitutional right under the United States' and state constitutions from the trial court or trial counsel. If the only issue confronting us was a conviction of murder, the proof of which was overwhelming in this case, we could more easily find beyond a reasonable doubt that the error did not prejudice West. In this case, however, the ingredient of the crime which raised the charge to capital murder is extremely close, and the argument of counsel could very well have tipped the scales from murder to capital murder.
Likewise, if no constitutional infringement was involved, we could easily follow the temptation of calling this invited error.[3]
Yet where a basic constitutional right is at stake, we must require more protection for an accused than afforded West in this case. See: State v. Smith, 101 Ariz. 407, 420 P.2d 278 (1966). The violation was so fundamental we must hold West was denied a fair trial. In Hawkins v. State, 224 Miss. 309, 330, 80 So.2d 1 (1965), we stated that where a constitutional error was violated affecting an accused's right to a fair trial the case will be reversed, regardless of the overwhelming proof of guilt.
This is especially true in a case in which the accused has been sentenced to death. It is our duty to examine the record on our own in every death penalty case to see that the accused received a fair trial. See: Williams v. State, 445 So.2d 798 (Miss. 1984); Leatherwood v. State, 435 So.2d 645 (Miss. 1983); Laney v. State, 421 So.2d 1216 (Miss. 1982); Irving v. State, 361 So.2d 1360 (Miss. 1978); Russell v. State, 226 Miss. 885, 85 So.2d 585 (1956).
In summary, under our heightened review obligation in this death penalty case, where a constitutional guaranty has been butchered, we are not foreclosed from protecting the accused even though his own attorney may have failed to make all the proper objections.[4]

*689 FURTHER PREJUDICIAL ARGUMENT
As noted during the course of the trial, the child witness Caprice Mangum was not giving an answer satisfactory to the prosecuting attorney, and he asked her if she was afraid. The circuit judge protected West's rights by excusing the jury immediately following the question. Then, out of the presence of the jury the prosecuting attorney asked her if West had threatened her. She replied, "Yes."
In closing argument the following transpired:
BY MR. PETERS:
... What did Mr. Gore say? "He's got his future." It's your decision to decide where he [West] spends that future. Caprice is still out there.
BY MR. GORE:
I object to that now 
BY MR. PETERS:
Gary is still out 
BY MR. GORE:
 if the Court please. He's getting out of line. He's trying to 
BY THE COURT:
Sustained 
BY MR. GORE:
Would the Court instruct the Jury to disregard that?
BY THE COURT:
Sustained. The Jury disregard this line of argument by the District Attorney.
BY MR. PETERS:
He has got his future. It's up to you people to decide where he spend its.
Thank you.
The district attorney thus concluded his argument, following which the court announced a recess for lunch. The following then transpired:
BY MR. GORE:
Excuse me, Your Honor. In order to protect my client, in view of Mr. Peters' remarks about Caprice being scared and having her future out there, I respectfully move the Court to grant a mistrial.
BY THE COURT:
Motion denied. I want to make sure the Jury understood that I instructed them to disregard that line of argument by the District Attorney. Do any of you feel that you cannot do so?
(NO RESPONSE BY JURORS)
BY THE COURT:
Apparently none.
The argument of the district attorney was blatantly inflammatory and outside the evidence before the jury. Although the court sustained the objection and instructed the jury to disregard the comment, he overruled the motion for a mistrial without having first determined as a fact from the jury that they could disregard this argument. The court then, rather than asking and requiring an affirmative promise from each of the jurors that they could disregard the argument, simply concluded by their silence to his question whether they could disregard the argument, that "apparently" they could.
It is doubtful that this line of argument could have been erased by the most conscientious effort on the part of the circuit judge. The perfunctory treatment of the highly prejudicial comment in this case gives no comfort of removing the prejudice.
It is true in most cases, where an isolated prejudicial question or comment by *690 the prosecution is promptly objected to and the objection sustained, and particularly when the circuit judge instructs the jury to disregard the incident, there is a presumption the action on the part of the trial court cured the error. See: Hubbard v. State, 437 So.2d 430 (Miss. 1983); Williams v. State, 427 So.2d 100 (Miss. 1983); Polk v. State, 417 So.2d 930 (Miss. 1982); Edwards v. State, 413 So.2d 1007 (Miss. 1982); Duke v. State, 340 So.2d 727 (Miss. 1976); Forrest v. State, 335 So.2d 900 (Miss. 1976); Holifield v. State, 275 So.2d 851 (Miss. 1973); and Showers v. State, 227 So.2d 452 (Miss. 1969).
This presumption is not without limitation, however. In Killingsworth v. State, 374 So.2d 221 (Miss. 1979), we reversed for inflammatory remarks by the prosecuting attorney despite the trial court's sustaining objections thereto.
In this case, involving a death penalty, we must hold this argument, especially when considered with the comment upon West's failure to testify, mandates reversal. See: Williams v. State, 445 So.2d 798, 810 (Miss. 1984).
In view of our decision, it is unnecessary to address some troubling assignments of error as to the penalty phase of the trial.[5]
REVERSED AND REMANDED.
PATTERSON, C.J., DAN M. LEE, PRATHER, ROBERTSON, and SULLIVAN, JJ., concur.
ANDERSON, J., and WALKER and ROY NOBLE LEE, P.JJ., dissent.
ANDERSON, Justice dissenting:
I respectfully dissent from the majority. I am mindful that in death penalty cases our responsibility is awesome and we will turn every stone to assure the accused a fair trial. With deference the majority has simply gone too far in this case. I agree that the district attorney's statements were improper and likewise agree that as an experienced prosecutor, he should have known better.
I must dissent, however, because I don't believe the remarks were sufficiently prejudicial to invalidate the jury's verdict.
The issue with regard to the defendant's failure to testify was interjected into the argument solely by defense counsel. During closing argument, the prosecutor reminded the jury that the defendant had not produced the alibi witnesses he said he would produce in opening statement. No mention was made of the defendant. Nevertheless, defense counsel objected, chosing to engraft upon the prosecutor's argument a comment upon the defendant not testifying. Thereafter, defense counsel sought to explain away defendant's silence as a defense "strategy", clearly asking the jury to draw a positive inference that the defendant could have testified favorably to the defense, but that he simply did not have to.
Mississippi Code Annotated, Section 13-1-9 (1972) precludes "counsel", not just the prosecution from commenting upon the accused's failure to testify. I would hold that where, as here, defense counsel interjects the issue and seeks a positive inference, a statement by the prosecution requesting the jury to reject this "strategy" is not error. Similarly, the other remarks by the prosecution I do not find to be error, and if anything, they were harmless. I would affirm the conviction and sentence.
WALKER and ROY NOBLE LEE, P. JJ., join this dissent.
NOTES
[1] We do not pass upon what effect the new Mississippi Rules of Evidence have on this question on retrial of the case.
[2] Defense counsel did have a right, however, if he chose to do so, to remind the jury of the court's instruction that no inference of any kind could be drawn from the defendant's failure to testify. This was simply stating the law, although it was of dubious value to West to do so.
[3] For cases from other jurisdictions in which comments by a defense counsel on his client's failure to testify did not warrant the degree of response made by the prosecution in rebuttal, compare: State v. Valentine, 375 So.2d 1378 (La. 1979); Franks v. Texas, 574 S.W.2d 124 (Tex.Cr.App. 1978); People v. Stout, 66 Cal.2d 184, 57 Cal. Rptr. 152, 424 P.2d 704 (1967); State v. Smith, 101 Ariz. 407, 420 P.2d 278 (1966).
[4] The impetus to this obligation of heightened review given by the U.S. Supreme Court is revealed by an examination of the decisions of that Court in two recent death penalty cases.

The U.S. Supreme Court in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) reversed and remanded an affirmance of a death penalty by sentence in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because of improper argument by the district attorney.
In the case of Booker v. State, 449 So.2d 209 (Miss. 1984), error was assigned for the same kind of argument by the prosecuting attorney. On p. 219 of that opinion we held the error was waived and barred because no contemporaneous objection had been made, and furthermore, the error was invited by defense counsel's argument. The U.S. Supreme Court vacated the judgment of conviction and has remanded the case to us for further consideration in light of Caldwell. See: Booker v. Mississippi, ___ U.S. ___, 105 S.Ct. 3493, 87 L.Ed.2d 626 (1985). Notably missing was any observation pertaining to invited error.
[5] Two examples: the questions of the prosecution to character witnesses and argument on the absence of "remorse" by West; and the argument by the prosecution that West would be a threat to the other inmates and guards of the penitentiary.