426 P.2d 386

**STATE of Arizona, Appellee,**
v.
**Charles HUGHES, Appellant.**
No. 1516.

Supreme Court of Arizona.
In Banc.
April 6, 1967.
Rehearing Denied May 9, 1967.

Darrell F. Smith, Atty. Gen., Phoenix, William J. Schafer III, Pima County Atty., Norman E. Green, Former Pima County Atty., Tucson, by Carl Waag, Former Deputy County Atty., Phoenix, for appellee.

W. Edward Morgan, Tucson, for appellant.

LOCKWOOD, Justice.

Defendant was convicted of attempted murder of his stepdaughter in violation of A.R.S. §§ 13–451 and 13–108. From the judgment of conviction and the sentence

thereon of ten to fifteen years in the state penitentiary, he brings this appeal.

Defendant lived with his wife, his baby daughter, and the alleged victim, his wife's daughter by a previous marriage, Sherri Lynn Hoffman, aged three and one half years. On December 13, 1963, the defendant was driving his automobile, with Sherri Lynn as the only passenger, returning from Christmas shopping. On his way home, defendant made a left turn into a "Triple B" market and crashed into it. Sherri Lynn was removed from the car, with a serious head injury. The cause of the crash was a complete brake failure. There was a conflict in the testimony as to whether the failure occurred immediately before impact or at some earlier time. There was also a conflict in the expert medical testimony as to whether the head injury suffered by Sherri occurred at the time of impact or at some earlier time. Shortly before the time of the "accident" the defendant as beneficiary had purchased two policies of $15,000 each in life insurance on his step-daughter, and two similar policies on his own daughter.

Defendant first complains that it was prejudicial error for the trial court to admit evidence of a prior incident in which Sherri Lynn came close to drowning. The facts pertaining to this evidence appear as follows:

On November 3, 1963, the defendant took his family, together with his two sons by a prior marriage, who were visiting him, to Canyon Lake for an outing. The two boys were either four and five or five and six years old. The defendant rented a motor boat, and took his two sons and Sherri Lynn in the boat for a ride on the lake. Life jackets were placed on all three children. The testimony is conflicting as to who placed the life jackets on the children. The witness Ruiz, who was the attendant who rented the boat to defendant, testified that the attendant was supposed to put life jackets on people who rented boats, but he did not always do so, because some people liked to do it themselves. Ruiz said he placed and tied the life jackets on the two boys, and that defendant placed the jacket on Sherri Lynn. Ruiz did not know whether defendant tied the jacket as it should have been. Another witness testified that he saw the children in life jackets and noticed that Sherri Lynn's jacket was not tied. He called this to the attention of defendant who said he would attend to it.

The boat, which defendant rented, had four seats back to back, two facing the front of the boat and two facing the rear. Ruiz testified that the two boys sat in the rear seat and the defendant and Sherri Lynn sat in the front seat. The defendant, however, insisted that the front seat was occupied by himself and his younger son, Mark, while the older son, Kirk, was seated directly behind the defendant with Sherri Lynn sitting beside Kirk.

Defendant stated he drove the boat on the lake upstream for some distance. Some time later, before 3:30 P.M., he was seen by the witness Doyle about seven miles from the boat dock, coming back downstream. At this point on the shore line are cliffs which reach as high as three hundred feet, and the lake follows a canyon through spaces which are sometimes wide and sometimes very narrow and crooked. The witness Doyle was driving his boat approximately ten miles an hour towards the upstream canyon portion of the lake (where defendant had gone) when he observed defendant approaching Doyle's boat, "at a fairly good rate of speed and with his hand waving in the air." Doyle stopped and defendant came within twenty to thirty feet of Doyle's boat, at which time Doyle stated defendant asked "Would my boat take him faster back to the landing than his." Doyle replied that it would not as his mother was with him and she could not take the pounding on the water. Doyle stated defendant said his girl had fallen in the water up the canyon, and Doyle told defendant to go on for help and that he, Doyle, would go looking for the girl. Defendant

left, heading in the direction called "down the canyon" toward the boat dock.

Doyle proceeded slowly up the canyon, and saw a "life jacket floating about three hundred yards off our right hand side." He approached the life jacket slowly, looking in the water and was "approximately a hundred yards from the life jacket" when he "spotted a white object floating beneath the surface of the water, approximately a foot, two foot, under the water."

Doyle approached this object slowly and determined that it was the body of a child floating face down in the water. He testified "all you could see was the white shoe in the water." With some difficulty, Doyle grabbed the girl by her hair and pulled her into the boat. He administered first aid for about twenty minutes before there was any sign of life, but at this point she began to twitch and artificial respiration was complete about twenty-five or thirty minutes after he recovered her from the water.

The life jacket was recovered by a person in another boat coming down the canyon. The person who recovered the jacket showed it to Doyle. Doyle testified that there were two strings to tie underneath the neck and that these strings were not tied when he saw the jacket. However there was a stomach strap which was tied or hooked. Both defendant and Doyle testified that the water was very dark and that it was difficult to see into it. Doyle stated that the water was "very, very dark and you couldn't even see three feet into it." Doyle further testified that when he returned to the boat dock area he met a boat containing a Deputy Sheriff and the defendant coming out of the area. Defendant immediately jumped into Doyle's boat and took Sherri Lynn in his arms, and after Doyle reached the landing, the defendant carried Sherri Lynn up the hill to where the mother was sitting in the parked car.

Defendant testified that he was unfamiliar with the lake area. He said he did not take his wife and their two month old infant daughter on the boat trip because he thought it would not be a good idea to have a new born baby out on the water and because his wife could not swim so he felt "it would be better to have three in the boat rather than five." Defendant testified that he could swim better than average. He stated that the attendant from whom he rented the boat, Ruiz, placed the life jackets on all three children. He further stated that the first time that he realized Sherri Lynn was not in the boat was when one of the boys said something to him about Sherri being gone or not being in the boat. He testified that he immediately looked in the boat and did not see Sherri. He stated:

"A. * * * that is when I looked back and I seen in the waves, because when the boat goes through it starts pushing the life jacket out, little waves. I seen it floating, so I immediately made a u-turn. I took my shoes off and hollered for the boys to lay down in the boat, the bottom of the boat. I went back, and I was standing high up by the driver's side, by the steering wheel. I was ready to dive in. I had the throttle back on the boat. I was ready to dive in. However Sherri was not in the life jacket.

"Q. Were you able to see her anywhere around the lake?

"A. Absolutely not. I searched and searched for her. I did not see her.

"Q. What actually did you do in looking for her?

"A. As soon as I got back to the life jacket and could not see her, of course I looked around in the immediate area. Now this, bear in mind it was in the late afternoon to where the water was shadowed. The water appeared to be very heavy or very dirty. I don't think you could see very far into it.

"Q. What did you do after you saw you were unable to spot Sherri?

"A. Well, right at that time when I could not spot her, the first thing to my

mind was, does a body come up three times as I have heard before on the T.V. and so forth, or whether it means adults or also a child. I moved the boat into a different position.. I moved up on the seat of the boat and tried to peer down into the water within a twenty, thirty foot radius of the life jacket. The boys were standing up, too. I asked them to be looking. I searched there I would say approximately two minutes. I moved the boat again into a different position and again looked at the water through an angle.

"Q. What did you do then?

"A. I was really convinced in my mind then she had drowned, so I wanted to get help.

"Q. What did you do to get help?

"A. I headed back down the canyon. Originally there had been people setting along the canyon, along the sides. I went back to see the first boat or first party, anybody I could get help."

He testified that he searched for Sherri Lynn in a radius of thirty feet of where the life jacket was, for about five minutes, and then was convinced that she had drowned, so headed back to "find help".

Defendant testified he met the witness Doyle about three quarters of a mile from the place where the life jacket was sighted, and after the conversation between them regarding whether Doyle could go faster for help, defendant followed Doyle's suggestion to go back to the dock to get help while Doyle went to look for the girl.

Defendant ran his boat aground on the shore and ran to tell his wife what had happened. A doctor was present and gave the defendant's wife a hypodermic. A deputy sheriff approached about that time and Hughes explained what had happened. After radioing for help, the deputy and defendant got in the deputy's boat and started out to look for Sherri Lynn, at which time they met the witness Doyle bringing her back to the dock.

About October 26, 1963 defendant had entered into negotiations with a life insurance agent, one Rogers, to purchase a life insurance policy in the face amount of $7,500.00 each on each of the two children, his infant daughter and Sherri Lynn. At the time of the discussion with agent Rogers, defendant told Rogers he was interested in a savings plan to be started for his children and he wanted policies not to exceed his income. The policies were completed by another agent, George Good, on October 28, 1963. At that time Good pointed out to defendant that a double indemnity clause had been included in the policies but that it was ineffective since it could not take effect on a child under the age of five years. At this point defendant asked that each of the policies be increased from $7,500.00 to $15,000.00, and the double indemnity clause be removed.

Defendant paid a small premium which was enough to keep the policies in effect for about two months. The beneficiary of the policies was the defendant. At the time the defendant purchased these policies, he had a policy of term insurance on himself as insured, in the amount of $25,000.00. The insurance agent Good testified that at the time the children's policies were purchased on October 28th, he discussed with defendant the feasibility of converting his term insurance to whole life instead of purchasing the policies on the two children. It further appeared by his testimony that had defendant converted his term insurance to whole life, the premiums would have amounted to approximately $650.00 a year as opposed to approximately $200.00 per year for the life insurance purchased on the two children.

In 1958 defendant was employed by a loan company. In November of that year a temporary license was issued to him to sell insurance as an agent for American Bankers Life Insurance Company. In March of 1959 he took an examination and qualifed for an agent's license which was issued. The examination was on the life and disability sections of the insurance code

in the Arizona Revised Statutes. He did not sell life insurance in general, but used his license in writing insurance in connection with the loans issued by his employer. He did not go into the type of insurance which he purchased on the two children.

The effective date of the policies on the children was October 28, 1963. However, it was necessary to secure approval from the insurance company and this did not come until December of 1963. On December 4, 1963 defendant talked with an insurance agent of another insurance company, asking about securing a policy of insurance in the amount of $15,000 on each of the two children (his own daughter and Sherri Lynn). He told the agent that he was afraid that the policies would not "come through" from the first insurance company and asked whether he could purchase such policies from the second insurance company. He was advised by the agent of the second insurance company, one Garfield, that he could do so. He paid a deposit on policies for $15,000 each for Sherri Lynn and for his daughter. It was a company rule that the insured should be examined, but this was not done on behalf of the first insurance company, although they were examined for the second company. It appeared that the second company never approved and did not issue the policies on the two children.

The policies purchased from the first insurance company were approved and returned to the agent on December 13, 1963. On that date, between 3:00 and 4:00 P.M., the agent called defendant and notified him that the policies had been approved. This was earlier on the same day on which defendant and Sherri Lynn were involved in the automobile incident at the supermarket, out of which arose the charge of attempted murder for which he was tried.

■ It is well established that evidence which shows that a defendant had or may have committed other crimes is prejudicial and usually inadmissible. See State v. Garcia, 96 Ariz. 203, 393 P.2d 668 (1964). It is inadmissible because it

"* * * tends to draw the attention of the jury away from a consideration of the real issues on trial, to fasten it upon other questions, and to lead them unconsciously to render their verdicts in accordance with their views on false issues rather than on the true issues on trial." Paris v. United States, 260 F. 529, 531 (8th Cir., 1919). However, the law is equally well settled that evidence of other crimes is competent when it tends to establish motive, intent, absence of mistake or accident, identity and common scheme or plan. See State v. Hardin, 99 Ariz. 56, 406 P.2d 406 (1965); State v. DeVinney, 98 Ariz. 273, 403 P.2d 921 (1965); State v. Akins, 94 Ariz. 263, 383 P.2d 180 (1963); State v. Daymus, 90 Ariz. 294, 367 P.2d 647 (1961).

■ When offered for any of these purposes, it is not necessary that the evidence establish that the crimes were perpetrated in an absolutely identical manner. State v. Akins, supra; Vigil v. State, 33 Ariz. 51, 262 P. 14 (1927). It is only necessary that such crimes be so related to each other that proof of one tends to establish the other. State v. Akins, supra; State v. Little, 87 Ariz. 295, 350 P.2d 756, 86 A.L.R. 2d 1120 (1960).

■ While in some jurisdictions it has been held that evidence of a prior crime must be such that the jury would believe beyond a reasonable doubt that the defendant had committed it, [Curry v. State, 169 Tex.Cr.R. 195, 333 S.W.2d 375 (1960); Ernster v. State, 165 Tex.Cr.R. 422, 308 S.W.2d 33 (1957); Pelton v. State, 60 Tex. Cr.R. 412, 132 S.W. 480 (1910)] the overwhelming weight of authority in other jurisdictions is that proof of a prior purported crime, and the defendant's connection with it, must be "clear", Hawkins v. State, 224 Miss. 309, 80 So.2d 1 (1955), or "clear and convincing", People v. Wade, 53 Cal.2d 322, 1 Cal.Rptr. 683, 348 P.2d 116 (1959); Wrather v. State, 179 Tenn. 666, 169 S.W.2d 854 (1943), or that there must be "substantial proof" that the other crime has been committed by the defendant, State v. Hyde, 234 Mo. 200, 136 S.W.

316 (1911); People v. Lisenba, 89 P.2d 39 (Cal., 1939), on rehearing, 14 Cal.2d 403, 94 P.2d 569 (1939), affirmed, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); State v. Carvelo, 45 Hawaii 16, 361 P.2d 45 (1961); See also 22 A. C.J.S. Criminal Law, § 690 and cases cited. Regardless of whether the words "clear", "clear and convincing" or "substantial proof" are used, the test appears to be that the proof both as to the commission of another crime and its commission by the defendant, must be by "substantial evidence sufficient to take the case to a jury." State v. Hyde, 234 Mo. 200, 250, 136 S.W. 316, 331 (1911).

In the present case there is no doubt of the identity of the defendant in the incident at the lake. The evidence of that incident was offered to show an attempted murder at that time by the defendant of his stepdaughter Sherri Lynn, for the purpose of establishing intent and lack of accident, and a common scheme or plan to commit the crime with which the defendant is here charged, i. e., attempted murder of Sherri Lynn. The questions for our consideration then are: (1) would evidence of an attempted murder of Sherri Lynn at the lake be competent ot show motive, intent or common scheme or plan to commit an attempted murder of Sherri Lynn as charged in the present case? (2) If so, was the evidence of the incident at the lake sufficiently substantial so that a jury could consider it a crime committed by the defendant?

◼ The defendant here is not charged with murder, but with attempted murder. Our statute defines an attempt to commit a crime as:

> "the performance of an act immediately and directly tending to the commission of the crime with the intent to commit such crime, the consummation of which fails on account of some intervening cause." A.R.S. § 13–108.

Therefore it was incumbent upon the state under the circumstances of this case, to prove the intent, since it could reasonably anticipate that the defendant would claim the automobile crash in which Sherri Lynn was injured was the result of an accident, (which he did at the trial).

In the incident at the lake, Sherri Lynn almost lost her life, while in the care and company of the defendant, under circumstances which might have indicated an attempt on the part of the defendant to murder her. If the evidence of this incident is sufficiently substantial so that a jury could find the defendant guilty of the crime of attempted murder, then it would be admissible as tending to prove that it was no accident that Sherri Lynn was again injured while in the care and company of the defendant, either as a result of the automobile crash or in some other manner somewhere near the time when the crash occurred. It would then tend to establish the intent to commit the crime with which defendant was charged.

◼ The evidence of how Sherri Lynn came to be in the water at the lake is entirely circumstantial. Circumstantial evidence may properly be considered as proof of a crime only when it is consistent with the theory of guilt of the defendant, and is inconsistent with every reasonable hypothesis of his innocence. State v. Alkhowarizmi, 101 Ariz. 514, 421 P.2d 871 (1966); State v. Thompson, 101 Ariz. 38, 415 P.2d 566 (1966).

In the light of this principle, we shall consider whether the evidence is as consistent with the theory of the defendant's innocence as with his guilt. On the one hand, the state has urged that the evidence proved that defendant deliberately left unfastened the ties on the life jacket of Sherri Lynn when he took her out on the lake and that she was sitting immediately beside him so that he could observe her. It is urged that when the defendant and the children arrived at a spot where there were no other witnesses, the defendant must have pushed or thrown the child into the water, and then have fled from the scene, deliberately leaving Sherri Lynn to drown. On the other hand, it is as reasonable to suppose that defendant did tie the life jacket

on Sherri Lynn, and that she was seated not beside him but immediately behind him where he could not see her without turning. It is further reasonable to believe that he did not know she was gone from the boat until one of his small sons notified him of that fact, and that he immediately turned the boat and searched for her in the vicinity of the life jacket, where it would be expected she might be found if she had fallen into the water. It is further reasonable to believe that the defendant, not being able to see any sign of Sherri Lynn on or near the surface of the lake during the five minute period when he was circling and searching the dark water for her, became convinced that she had drowned and that in panic he set off toward the boat landing to find someone else to help him search for the body. The testimony of the witness Doyle that the defendant tried to get him to take the defendant back to the boat landing in the assumption that Doyle's boat was faster, and finding this was not possible, continued on to get help in the search, with the understanding that Doyle would also search for the little girl in the meantime, is consistent with defendant's story that he was convinced Sherri Lynn was drowned, but wanted to find her and was looking for someone to help in the search in which he had been unsuccessful. The fact that the witness Doyle was fortunate enough to see a white object, which he later identified as a little shoe about two feet under the water, and a considerable distance away from the life jacket, is not inconsistent with the fact that the life jacket had drifted away in the waves caused by the motor boat, and defendant was unable to find the little girl on his original search. Newspapers are full of accounts of searches for lost people in which some searchers pass them by, while others are fortunate enough to find them

Thus it will be seen that so far as the incident at the lake is concerned, there is only circumstantial evidence that the defendant performed an act immediately and directly tending to the commission of the crime of murder, and is as reasonably consistent with a hypothesis of his innocence as with his guilt. Although the evidence of the lake incident, if viewed in the light urged by the state, is fraught with much suspicion, a jury may not speculate upon suspicions to determine whether in fact a crime was there committed by the defendant. It should not have been admitted.

There is no doubt the evidence of the incident at the lake was highly prejudicial in nature, and the case must therefore be reversed. The other matter urged by defendant as prejudicial error, viz., such pretrial publicity as might have prejudiced the jurors, doubtless will not recur, so it is unnecessary to discuss it.

Case reversed and remanded for proceedings not inconsistent with principles expressed in this opinion.

BERNSTEIN, C. J., McFARLAND, V. C. J., and STRUCKMEYER, J., concur.

UDALL, Justice (dissenting):

I cannot agree with the majority of this Court that it was prejudicial error for the trial court to have admitted evidence of the lake incident in which Sherri Lynn nearly met her death. I am convinced that such evidence was admissible under the well-recognized exception to the general rule to show motive, intent or common scheme or plan.

The incident at Canyon Lake occurred on November 3, 1963 while the alleged automobile accident, for which defendant was tried for attempt to commit murder, happened on December 13, 1963. The two acts are sufficiently united as to time. There is no dispute that defendant was present at both of the incidents.

The questions presented are whether the evidence substantially established the other crime and if there is a connection between the Canyon Lake incident and the automobile incident. The evidence introduced at the trial taken in the light most favorable to sustaining the jury's verdict, is as fol-

lows: The defendant was discharged in bankruptcy on March 27, 1963; on December 13, 1963 defendant owed Termplan, Inc. the sum of $2,100, and payment on that loan was delinquent eight days on the date of the accident; defendant owed Sears Roebuck the sum of $791.44, and was delinquent four months on payments; a debt of $1,968.72 owing to General Motors Acceptance Corp. and the account delinquent for two months; a loan of $14,061.97 past due for four months and an action started in court by the First National Bank of Arizona to recover; delinquent account of four months to Montgomery Ward in the sum of $2,030.62; and payments to Arizona Trust Co. on a home loan delinquent for four months. This summary of the financial status infers motive especially in view of the evidence that the accused was still spending money freely at the time of the automobile incident.

The matter of insurance transactions is also important. On October 25, 1963 defendant ordered insurance policies on two children, one being his step-daughter, Sherri Lynn, the same victim in both incidents. Insurance agents testified that the policies were the worst possible type of policy for accumulating savings, the alleged purpose, but were the best the defendant could purchase from a protection viewpoint. After being informed that the double indemnity clause was not in effect until age 5, the defendant raised the face amount of the policies from $7500 to $15,000. The small premium paid by defendant was enough to keep the policies in effect until about December 23, 1963. The insurance agent testified the policies were effective on October 28, 1963.

On December 4, 1963 the defendant purchased two policies of $15,000 on each of the children from another insurance company. The next morning the children had a medical examination as required by the company. Defendant was the first beneficiary in both policies; again the policy was the type yielding the highest death benefit and lowest cash value.

The jury could have reasonably concluded that defendant took out insurance policies on his stepdaughter, which policies were best calculated to produce the highest return to him in event of death; that the policies were least appropriate for savings purposes and most appropriate for securing a high return in event of death; and, because of his training in the insurance field, as mentioned in the majority opinion, he was fully aware of the effect and significance of his acts.

The following paraphrases the evidence concerning the lake incident as admitted at the trial to show a plan or scheme or intent: A witness testified that defendant approached him at a fast rate of speed and asked him if his boat would take them back to the landing faster than defendant's. The witness stated that it would not and after telling defendant to go for help, proceeded to look for the child. A life jacket floating on the water was sighted by the witness and the young girl was found approximately 100 yards from the life jacket a foot or two under the water. There is no evidence in the record of any strong wind or other natural factor which could account for the separation of the child and life jacket by such a great distance.

The witness testified it was a distance of one-half to three-fourths of a mile from the point where he met defendant to where he found the girl. Thus, there was only a short interval of time from when defendant left the scene of the alleged accident until the witness discovered the victim. Certainly the only reasonable inference from this testimony would be that defendant threw the victim in the water and started away from her, then remembering the life jacket which he had had removed from her, tossed the life jacket into the water. When the life jacket was found the two strings under the neck were not tied.

Furthermore, even if the testimony of defendant were to be believed that he searched for Sherri Lynn for five mintues in the vicinity of the life jacket before

starting back to the landing, the above is still the most reasonable inference for had someone appeared on the scene during that time, the defendant could rest fairly assured of both an alibi and that the little girl would not have been found in the vicinity of the life jacket; thus, there would have been but a small chance she could be rescued in time to save her life and defendant's deed would not be undone.

Deputy Sheriff, J. F. Smith, of Maricopa County, testified that on November 3, 1963, close to 3:30 p. m., he saw the defendant from approximately 35 to 40 yards, and he had to ask what happened after he heard that a girl had fallen in the water. Although there were no obstructions between the parties, the defendant made no attempt to report the incident to the deputy. There was testimony that defendant had to be questioned in order to elicit further information although he allegedly came back for help.

Defendant, in his conversation with Deputy Smith, stated that one of his sons asked him where the girl was and this was the first time he noticed she was missing. Defendant stated to Smith that he did not get into the water, saying "You would have had two of us to save. No use both of us drowning." In addition, another deputy sheriff testified that the defendant said, "Why should I pull my shoes and socks off and jump in when I can't swim."

The custodian of the Police Records at the Tucson Police department produced a document that was sworn to by defendant when he applied for a position with the department, which was admitted in evidence. In this application, made under oath, defendant stated his principal hobbies were swimming and skiing, and in answer to the question, "Can you swim?" his answer was, "Yes, expertly, very good."

I believe that when taken with the testimony as to defendant's financial condition and the insurance policies on the victim's life, the evidence of the Canyon Lake incident, though circumstantial, is more than sufficient to meet the test adopted by the majority of this Court; that is, the proof both as to the commission of another crime and its commission by the defendant must be by "substantial evidence". The majority concedes that the evidence "is fraught with much suspicion"—but, I am of the opinion the evidence raises more than a mere suspicion and that the trial judge correctly exercised his discretion in admitting it. In State v. Waits, 1 Ariz.App. 463, 466, 404 P.2d 729, 732, it was stated:

"Evidence which creates 'a mere suspicion' that the accused committed the other acts is not enough and the other offense must be proved with 'some certainty.' People v. Edwards (3rd Dist. 1958), 159 Cal.App.2d 208, 323 P.2d 484. But the proof need not be beyond a reasonable doubt. People v. Rickson (4th Dist. 1952), 112 Cal.App.2d 475, 246 P.2d 700.

"Within these two limits, that is, that the evidence must be such as to create more than a suspicion and the requirement that there be proof beyond a reasonable doubt, this court holds *there is an area of discretion in the trial court* which is not violated in this action." (Emphasis added.)

In my view, the above is the proper interpretation of the "substantial evidence" test. Such a rule protects both the accused and the public adequately, and places the determination of the quantum of evidence present in each case on the trial court.

Lastly, I wholeheartedly disagree with the statement of the majority that when the evidence of a prior crime is circumstantial, as it is here, such evidence may only be admitted when it is consistent with the theory of guilt of the defendant and is inconsistent with every reasonable hypothesis of his innocence. This position is indefensible on any logical or rational basis. I readily admit that such is the correct rule of law to be applied in the situation wherein circumstantial evidence is relied upon to prove the commission of the very crime the defendant is presently on trial for; however, I believe that rule has no application

in the instance where evidence of a prior crime is merely offered to show motive, intent or common scheme or plan. In the latter situation, the defendant is not being tried for the alleged prior crime and thus, as the majority opinion states, the commission of it need not be proved "beyond a reasonable doubt" or even by "clear and convincing proof"; it need only be shown by "substantial evidence". To require, as the majority does, that when the proof of a prior crime is by circumstantial evidence that it be inconsistent with every reasonable hypothesis of the defendant's innocence, is to demand much more than substantial evidence. In effect, it requires proof "beyond a reasonable doubt" or at the very least "clear and convincing" proof of the prior crime, both of which tests were supposedly discarded by this Court in favor of the substantial evidence test in the majority opinion.

For the above reasons, I would affirm the judgment of the lower court.