583 P.2d 229

STATE of Arizona ex rel. John A. LaSOTA, Jr., Acting Attorney General, Petitioner,

v.

The Honorable Robert J. CORCORAN, Judge of the Superior Court, in and for the County of Maricopa, Respondent,

and

Jonathan Charles TREADAWAY, Jr., Real Party in Interest.

No. 13695.

Supreme Court of Arizona, In Banc.

June 20, 1978.

Rehearings Denied July 18, 1978.

John A. LaSota, Jr., Atty. Gen., Stanley L. Patchell, Asst. Chief Counsel, Crim. Div., John Pressley Todd, Asst. Atty. Gen., Phoenix, for petitioner.

Goldstein, Flynn & Mason, Ltd. by John J. Flynn, Phoenix, for respondent real party in interest.

GORDON, Justice.

In December, 1974, a jury found Jonathan Charles Treadaway guilty of sodomy and first degree murder. On appeal, this court reversed the judgment and remanded the case for further proceedings. *See State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977). In preparation for the forthcoming retrial, Treadaway's counsel submitted numerous motions *in limine* to the trial court. Several of these motions were granted, thereby preventing the state from introducing certain evidence at trial. In order to contest the trial court's ruling prior to the commencement of the trial, the state filed this special action pursuant to the Rules of Procedure for Special Actions, 17A A.R.S.

In the great majority of actions, it is preferable to review a case in its entirety following a trial. This not only eliminates conjecture by focusing the issues in the light of the completed events which occurred at trial, in the sequence and context in which they occurred, but also prevents piecemeal appellate supervision of trials which tends to prolong litigation and is generally not conducive to judicial economy. However, we have accepted jurisdiction in this special action because of the unique posture of the case. We previously reversed Treadaway's conviction because of the trial court's error on an evidentiary issue. Now, prior to the retrial, the trial court, in ruling on a similar and equally important evidentiary issue, has apparently misconceived the holding of *State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977).

The facts underlying the charges against Treadaway are as follows: In the early morning hours of August 30, 1974, a mother found her six year old son dead in his bed. An autopsy of the boy indicated that he died of asphyxia and had been sodomized.

Apparently someone had entered the home through a living room window, but did not steal anything. The evidence linking Treadaway to the incident basically consists of two palm prints found on the outside of the boy's locked bedroom window, and pubic hairs found on the child which were similar to Treadaway's.

The five major issues raised by the state in its petition for special action concern the admissibility of:

(1) A prior bad act, "the Brown incident";

(2) Treadaway's pre-arrest statements;

(3) Statements by Treadaway while in custody;

(4) Prior trial testimony;

(5) A letter from Treadaway to his parents.

### *The Brown Incident*

As part of its case against Treadaway, the state planned to introduce evidence of other prior bad acts in order to demonstrate an emotional propensity by Treadaway to commit the crimes charged. One of these incidents occurred on May 31, 1974, three months prior to the occurrence of the crimes charged. On that morning, Mrs. Brown discovered her son being strangled by a nude attacker in his bedroom. When the mother entered the boy's room, the attacker jumped up and fled through an open window. Sometime during the struggle, a necklace composed of beads was pulled off the attacker. Outside the boy's window, the police discovered a shirt and a pair of cut-off blue jeans.

Following a pre-trial hearing to determine the admissibility of this incident, the trial court ruled:

"It is ordered granting defendant's Motion in Limine relating to the Brown incident of 1974. The Court finds that there was no reliable expert medical testimony that the same person would have perpetrated the Brown incident and [this] homicide."

The state then avowed that it could offer additional evidence on the issue of emotional propensity. The court then ruled:

"Well, notwithstanding, and taking the offer of proof to be true, I still find that as to the Brown Incident the Court finds that there is no substantial evidence that the defendant committed those acts;"

After a careful review of the record, we have concluded that the trial court abused its discretion by excluding the Brown incident from evidence. That a defendant committed another crime need not be proven beyond a reasonable doubt in order to introduce evidence of that crime at a trial on another matter. It is only necessary that, "the proof both as to the commission of another crime and its commission by the defendant, must be by 'substantial evidence sufficient to take the case to a jury'." State v. Hughes, 102 Ariz. 118, 123, 426 P.2d 386, 391 (1967); State v. Mitchell, 112 Ariz. 592, 545 P.2d 49 (1976).

Here, the requisite proof of the occurrence of the Brown incident has been supplied. Consequently, the critical issue is whether the state has adequately established that Treadaway was the attacker. The most incriminating evidence linking Treadaway to the Brown incident is the necklace which the boy ripped from the throat of the attacker. At the pretrial hearing, the state produced color photographs of Treadaway wearing a necklace which appears to be the same necklace as the one found at the Brown's house. According to the person who photographed Treadaway, the pictures were probably taken in April or May, 1974, although they could have been taken as late as June, 1974. Both the necklace in the picture and the one found at the Brown's house consisted of a variety of beads. The center bead in each is a yellow African trade bead with blue spots and red lines. Trade beads are considered unique because they were produced centuries ago in Venice, Italy, each having a distinctive pattern. In one orientation of the bead on the "Brown" necklace, the arrangement of the blue spots seem to coincide with the bead in the picture. On either side of the trade bead in the "Brown" necklace is a series of smaller beads of different sizes, colors and shapes arranged in groups of three or four. Due to the poor quality of the picture, it is not possible to count the exact number of individual beads, but the color, size and arrangement of the beads in that necklace seems to parallel the necklace found at the Brown's residence. Finally, as to the necklace, Treadaway told his friend who had given him the necklace, that he had lost it running from the police.

In addition to the necklace, the clothes which were found outside of the boy's window are probative of the identification of the attacker. Head and pubic hairs found in the clothing were similar to samples taken from Treadaway. Furthermore, a police criminalist found a crab louse egg sack, which he considered to be rare, on a pubic hair taken from Treadaway and on one from the clothing. Although evidence negating the inference of Treadaway's culpability was also presented at the pretrial hearing on the Brown incident, we believe reasonable minds could differ on this issue. Thus the evidence is sufficient to warrant presenting the Brown incident to the jury. Since we have concluded that the evidence of the Brown incident meets the standard of State v. Hughes, supra, and State v. Mitchell, supra, we turn to the theory which permits the admission of the this prior act at the forthcoming trial.

In its initial ruling, the trial court excluded the Brown incident because "there was no reliable expert medical testimony * *." This ruling seems to misconstrue our holdings in State v. Treadaway, 116 Ariz. 163, 568 P.2d 1061 (1977) and State v. McFarlin, 110 Ariz. 225, 517 P.2d 87 (1973).

We reversed in State v. Treadaway, supra, stating:

"[T]he admission of this prior bad act * * * constitutes reversible error unless and until there is reliable expert medical testimony that such a prior act three years earlier tends to show a continuing emotional propensity to commit the act charged." (Emphasis added.) Id. 116 Ariz. at 167, 568 P.2d at 1065.

The incident then at issue was not the Brown attack. There, remoteness in time was a problem because a three year lapse in time could have vitiated its predictive value. Also the act was different than the crime with which Treadaway was charged, and, therefore, may have involved different psychological and emotional dispositions. Thus, it can be seen that *State v. Treadaway, supra,* only controls if the prior act is either not similar to the crime charged or not near in time.

 Reliable expert medical testimony is not always required before a prior act may be admitted pursuant to the emotional propensity exception.

"In those instances in which the offense charged involves the element of abnormal sex acts such as sodomy, child molesting, lewd and lascivious, etc., there is sufficient basis to accept proof of similar acts near in time to the offense charged as evidence of the accused's propensity to commit such perverted acts." *State v. McFarlin,* 110 Ariz. 225, 228, 517 P.2d 87, 90 (1973).

As the Brown incident is both similar and near in time to the crimes for which Treadaway is now accused, its admissibility is governed by *State v. McFarlin, supra,* rather than *State v. Treadaway, supra.* Therefore, to exclude this incident on account of a lack of reliable expert medical testimony would constitute an abuse of discretion.

### Pre-Arrest Statement

A police report prepared by Detective Ysasi on September 13, 1974 indicates that on Wednesday, September 11, 1974, Ysasi and another officer went to the Treadaway house to interview Jonathan, who at that time was still just a suspect, and to take some palm prints. The police introduced themselves to Jonathan's father and were invited into the house. After the parties briefly discussed the incident of August 30, Mr. Treadaway called Jonathan into the room. The police report states that when Jonathan was introduced to the police he "remarked that he knew we would be contacting him and wanted to know what had taken so long".

The state contends that the statement is admissible as an "admission against interest" on the theory that the statement demonstrated, within the meaning of *State v. Fears,* 116 Ariz. 494, 570 P.2d 181 (1977), a mental attitude on the part of Treadaway that was probative of his guilt of the Jordan crime.[1]

The defense contends that the statement contained in the police report is not the actual statement uttered by Treadaway, but is rather only a one line summary of a longer conversation that took place between Treadaway and Ysasi. At the first trial Detective Ysasi's testimony concerning the conversation was as follows:

"When we first got there, he was in the room, and then he left along with the other people; and his father called him back after we had a conversation; and when we identified ourselves and told him why we were there, he remarked that he had been expecting this, asked what had taken us so long.

"The conversation then went into when it would be convenient for him to come to the police department identification bu-

---

1. The following passage is a police officer's testimony in *State v. Fears, supra,* regarding certain statements the defendant had volunteered:

"He also stated: 'If I beat this in Court, do I get my stuff back, like my knife?'

"The first statement he made, 'You may win this in Court, but I will win the appeal, because you have to bring all the witnesses back.' Another statement he made was, 'Don't give me any lip or I won't give you the samples. Because contempt of Court—when you are talking about 20 years of my life—isn't that a big deal.'

"He also made the statement, 'You don't have your little tape recorder on. You try to use this in Court and I'll deny I ever said it.' " *Id.* at 497, 570 P.2d at 184.

In holding these statements admissible, the court said, "These statements show the mental attitude of the defendant as it relates to the crime charged. This mental attitude would be probative of defendant's guilt or innocence and the jury should be allowed to consider these statements along with others in determining the defendant's guilt." *Id.* at 498, 570 P.2d at 185.

reau. It was agreed that it would be the next day, which was the morning of the 12th.

"At that time he also volunteered his hair. We told him we'll wait until the following day and obtain it.

"Also, there was conversation reference a shirt that we had, and he put on the shirt and stated that it was a nice shirt, wanted to know if we wanted to sell it.

"In reference to the remark about what took us so long, I asked, 'Why?'

"And I think his response was that he knew we would be coming.

"Why did he figure that? *And his reply was because of his past record.*" (Emphasis added.)

The trial judge granted the defense motion *in limine* to suppress the 'statements holding that "the statement by the defendant was not any acknowledgement of guilt on his part but was a simple acknowledgement that he had a prior record". The trial judge further held that admitting the statement "would be bringing in an issue as to his prior record" evidence as to which had already been otherwise ruled inadmissible.

■ We agree with the trial judge that when taken in the context of the entire conversation, any statement by Treadaway to the effect that "he had been expecting this, * * * what had taken us so long" did not express a consciousness of guilt of the Jordan murder, but merely reflected an awareness by Treadaway that, because of his prior record, the police might be contacting him during the course of their investigation. In terms of the standard for admissibility set forth in *State v. Fears, supra,* Treadaway's statement may "show the mental attitude of the defendant as it relates to the crime charged", in the sense that he was aware he might be a suspect. However, since the statement was made with reference only to his prior record, the mental attitude it represents is not at all "probative of his guilt or innocence" of the Jordan incident. Hence, the statement cannot be regarded as an admission against interest and was properly excluded as not being relevant or material to any issue in the current case. Furthermore, we agree with the trial judge that any relevance the statement might have would be clearly outweighed by the prejudice that might permeate appellant's case if evidence of a prior record was placed before the jury. *See State v. Hughes,* 102 Ariz. 118, 426 P.2d 386 (1967); *State v. Babineaux,* 22 Ariz.App. 322, 526 P.2d 1277 (1974); Rule 403, Arizona Rules of Evidence.

### Statements by Treadaway While in Custody

At approximately 11:00 a. m. on September 13, 1974, Detective Ysasi and another police officer returned to the Treadaway household to arrest Jonathan. The police report of the arrest and subsequent events states that while the detectives were at the house, but before they formally arrested Treadaway, Treadaway's father contacted an attorney. The report indicates that the police were aware that Treadaway had originally contacted an attorney prior to the date of the arrest and that the attorney was familiar with the case.

After arresting Treadaway, the officers read him his rights. Treadaway stated that he understood his rights. However, when the officers asked him whether he would voluntarily answer questions, he answered that he would not.

According to the police report, at some point during the trip from Treadaway's house to the police station, "Jonathan commented that he would probably be a scapegoat as we did not have any other suspects and we would get him because of his previous record".

When they arrived at the police station, Treadaway was brought to the Homicide Detail Office where the arrest record was completed and other forms were filled out. Treadaway was then taken to the Identification Bureau where a technician took another set of palm prints. After the prints were taken, and about one hour after Treadaway had volunteered the scapegoat statement, Ysasi asked Treadaway for an additional pubic hair sample. When Tread-

away reached inside his pants to provide one, the officer asked Treadaway to drop his pants to be sure that he picked a hair from the proper area. When Treadaway complied with this request, Ysasi immediately noticed that the perimeter of Treadaway's pubic area had been shaved.

The evidence conflicts as to what occurred next. The police report states, "*When asked* why his pubic area was shaved Treadaway stated that he had crabbed, that he had gotten crabbed from his girl friend". (Emphasis added.) At his first trial, Treadaway's testimony was also to the effect that Ysasi had asked him "Why I had shaved down there?" Detective Ysasi claims that he did not question Treadaway in the sense of pointedly asking him "Why did you shave your pubic area?" Rather, he contends that upon seeing the unusual sight of a shaved pubic area, he merely exclaimed in a startled fashion "Shaved?". Whichever version is correct, it is not disputed that Treadaway responded by stating "that he had crabbed, that he had gotten crabbed from his girl friend".

After discussing the "crabs" statement, the police report continues, "*During the brief interview* in the Homicide Detail Office, Jonathan Treadaway was *asked to explain* how his palmprint was lifted from the bedroom window occupied by the victim * * *, and he stated, that he did not have an explanation and also that he was not going to give officers any information". (Emphasis added.)

The state proposed to introduce at trial all the above described statements. The trial judge granted the defense motion *in limine* to suppress the statements on the grounds that each had been elicited in violation of Treadaway's rights under *Miranda*.

The basic principle articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is that no statement taken from an accused pursuant to interrogation while he is in custody can be used against him at trial unless the state proves that the accused was advised of and waived his Fifth and Sixth Amendment rights. However, the court was careful to point out

that it was only statements made pursuant to police interrogation that raised the spectre of a violation of constitutional rights. "The fundamental import of the [Fifth and Sixth Amendment] privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warning and counsel, but whether he can be interrogated". *Id.* at 478, 86 S.Ct. at 1630. The court held that any volunteered statements, not prompted by interrogation, were not affected by the concepts developed in the opinion and were admissible. Hence, in evaluating the trial judge's ruling, the threshold issue that must be resolved is whether any of the statements were made by Treadaway pursuant to interrogation.

Custodial interrogation was defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody". *Id.* at 444, 86 S.Ct. at 1612. As to the "scapegoat" statement, there is no evidence that the police questioned Treadaway prior to his making the statement or any other indication that the statement was not voluntarily and spontaneously uttered. Hence, the trial judge erred in ruling that the statement was obtained in violation of Treadaway's constitutional rights. However, we do feel that in the present posture of the case the statement should be excluded from the trial for the reason that the prejudice to the defendant in placing before the jury the allusion in the statement to a prior criminal record clearly outweighs any relevance the statement might have. *See* Rule 403, Arizona Rules of Evidence.

Even if it is assumed that Detective Ysasi's memory of the circumstances in which Treadaway offered the "crabs" statement is accurate, it is our judgment that the one word utterance "shaved" constitutes interrogation. Ysasi admitted in his testimony at the suppression hearing that the statement "shaved" was uttered in the form of a question. The fact that the question was asked as a one word sentence rather than the more complete sentence "Why did you shave?" does not make it any

less a question for purposes of constitutional analysis. Also, the question must be regarded as interrogation even though it may have been asked reflexively without any intent to elicit damaging evidence. *See Proctor v. United States,* 131 U.S.App.D.C. 241, 404 F.2d 819 (1968).

■ As to the "no explanation" statement, the police report indicates that it was made by Treadaway during a "brief interview" at which he "was asked to explain how his palmprint was lifted". Such a direct request to explain incriminating evidence clearly constitutes interrogation.

■ Since we have concluded that the trial judge was correct in finding that two of the post arrest statements were prompted by "custodial interrogation", we must address the state's contention that Treadaway had waived his right to remain silent and his right to the assistance of his retained counsel prior to making the statements. In a recent discussion of the level of proof required of the state to demonstrate a waiver of constitutional rights, the United States Supreme Court in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977) held that the question of waiver is a matter of federal constitutional law, and that "it was incumbent upon the state to prove 'an intentional relinquishment or abandonment of a known right or privilege' ", *Id.* at 404, 97 S.Ct. at 1242. The court further stated, "courts indulge in every reasonable presumption against waiver". *Id.* at 404, 97 S.Ct. at 1242. While we agree with our Court of Appeals that, "there is no sacred litany required to prove

a waiver of constitutional rights provided the heavy burden of showing defendant acted knowingly and voluntarily is met", *State v. Richmond,* 23 Ariz.App. 342, 344, 533 P.2d 553, 555 (1975), the court in *Brewer,* specifically held that there must be some *affirmative indication* that the suspect did, in fact, waive his rights by some words or conduct on his part and that the standard is not met merely by showing that the defendant made an incriminating statement in response to a question. Since the state has not adduced any evidence of waiver other than the fact that Treadaway answered a couple of questions,[2] its burden of proving waiver has not been met.[3]

### Prior Testimony

At the first trial, the prosecution was permitted to place before the jury a great deal of evidence that has been ruled inadmissible in the current case. The evidence included such items as the pre-arrest statement, "What took you so long?" the post-arrest "scapegoat", "crabs" and "no explanation" statements, Treadaway's letter to his parents,[4] and additional references to Treadaway's prior record. Treadaway testified in his defense. Much of his testimony was directed toward defending against or explaining this now inadmissible evidence.

Relying on the case of *Harrison v. New York,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the trial judge ruled that none of the prior testimony would be admissible at the new trial in the state's case in chief. The judge reserved the question, under *Harris v. New York,* 401 U.S.

2. Some cases have held that a waiver of constitutional rights can be demonstrated if the accused rather than the police initiates the interrogation session. *State v. Moore,* 27 Ariz.App. 275, 554 P.2d 642 (1976); *State ex rel. Berger v. Superior Court,* 105 Ariz. 553, 468 P.2d 580 (1970); *State v. Richmond, supra.* In our opinion Treadaway's volunteered "scapegoat" statement cannot be characterized as an initiation of questioning within the meaning of these cases. It was merely an exculpatory statement which did not indicate to the police a desire to answer the questions that were put to him almost an hour later.

3. Our discussion above concerns only statements elicited from Treadaway by police questioning. As it does not appear that Ysasi's request that Treadaway drop his pants was improper, there is no constitutional basis for excluding testimony by Ysasi as to what he observed when Treadaway lowered his pants. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. State of California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Of course, the trial judge should pass on the relevancy of any such evidence *prior to its being admitted.*

4. As is discussed below, the letter has not yet been ruled inadmissible in its entirety.

222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), "as to what use the defendant's previous testimony can be put if and when he testifies in the pending trial".

To properly evaluate the trial judge's ruling, it is necessary to set out the facts of the *Harrison* case in detail. At Harrison's first trial, the prosecution introduced three confessions made by Harrison while he was in police custody. The substance of the confessions was that Harrison, while armed with a loaded shotgun, had gone to the victim's house intending to rob him, and that the victim was killed while resisting Harrison's entry into the house. Harrison took the witness stand in his own defense in an attempt to explain away the confession. In his testimony he admitted being at the scene of the shooting, but attempted to persuade the jury that the killing had been accidental. On appeal of the first conviction, the Court of Appeals held that the confessions had been illegally obtained and were therefore inadmissible. *Harrison v. United States,* 123 U.S.App.D.C. 230, 359 F.2d 214 (1965).

At Harrison's retrial, the confessions, of course, were not introduced. However, his testimony from the first trial was. Harrison was again found guilty. The Supreme Court began its analysis of the admissibility of the prior testimony with the general principle that testimony of a defendant at a former trial is admissible in evidence against him at a later proceeding. The court then held that since the government could not demonstrate that the defendant's decision to testify had not been "impelled" by the use of the illegally obtained confessions, no portion of defendant's testimony during the first trial could be used in the later proceedings. The rationale for the ruling was that the trial testimony was so directly related to the use of illegally obtained evidence that the testimony must be regarded as the "fruits of the poisonous tree".

"In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, * * *.

"Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby— the fruit of the poisonous tree, to invoke a time-worn metaphor. * * *

"In concluding that the petitioner's prior testimony could be used against him without regard to the confessions that had been introduced in evidence before he testified, the Court of Appeals relied on the fact that the petitioner had 'made a conscious tactical decision to seek acquittal by taking the stand after [his] in-custody statements had been let in * *.' But that observation is beside the point. The question is not *whether* the petitioner made a knowing decision to testify, but *why.* If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison v. New York,* 392 U.S. at 222–223, 88 S.Ct. at 2010.

Because of the Supreme Court's reliance on the "fruits of the poisonous tree doctrine" to exclude the prior testimony, it is our opinion that, except as qualified below, the rationale of the *Harrison* case cannot be applied to exclude Treadaway's prior testimony. As articulated in the case of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), a necessary predicate to the application of the "fruits" doctrine is that the evidence which led to the discovery of the fruit must have been obtained in violation of a person's Fourth or Fifth Amendment rights. With this in mind, the critical difference between the *Harrison* and *Treadaway* cases is that while the evidence which allegedly "impelled"

Treadaway to testify at the first trial was "improperly introduced", most of it was not illegally obtained.[5] Hence, it cannot be said that the testimony was "tainted by illegality". In constitutional parlance, there was no poisonous tree.

Although we conclude that, except for any testimony that may have been impelled by the "crabs" or "no explanation" statements, there is no constitutional basis for excluding Treadaway's prior testimony, it does not necessarily follow that the evidence should be admitted at the forthcoming trial. Cases which hold that a defendant's testimony at a former trial is generally admissible against him in subsequent proceedings are referring only to the fact that "former testimony" is a well established exception to the hearsay rule. Like any other proffered evidence, however, "former testimony" must also meet the tests of relevancy and absence of overriding prejudice as a condition of admissibility.

At the trial, the judge should exclude any prior testimony offered by the state that the state cannot prove was not impelled by the introduction at the first trial of the "crabs" and "no explanation" statements. As for any other prior testimony the state may offer, the trial judge should evaluate each item in light of evidentiary rulings already made or still to be made in the case. Any item which is irrelevant or the probative value of which is substantially outweighed by the danger of prejudice should also be excluded.

### Letter

While Treadaway was incarcerated he wrote a letter to his parents. The trial court found that Treadaway delivered the letter to his attorneys who, in turn, delivered it to the state with Treadaway's knowledge. Although his motion to suppress was denied the court did grant a motion *in limine,* ordering that:

"Before the state may refer to the letter before the jury, a hearing must first be had to determine whether the letter or any portion of it, is material and relevant to the issues to be determined by the jury."

In accordance with the foregoing rulings on the pre and post-arrest statements it would follow that parts of the letter will be inadmissible at the forthcoming trial. However, the time is not ripe to now consider the entire letter. *See Matlow v. Matlow,* 89 Ariz. 293, 361 P.2d 648 (1961); *McElwain v. Schuckert,* 13 Ariz.App. 468, 477 P.2d 754 (1970). Thus, the admissibility of the remaining parts of the letter lies with the sound discretion of the trial court to be decided when and if the letter is offered during the trial.

In its petition for special action, the state raised a number of issues in addition to the five we have discussed above. We have carefully evaluated the allegations of error and find that, when considered in light of the evidentiary rulings the trial judge had made at the time, each issue was resolved correctly. Of course, if requested by the state, the trial judge should reconsider any of his prior rulings, not specifically addressed above, that may be affected by our holdings here.

Prayer for relief granted in part and denied in part. The stay order previously entered is vacated. The case is remanded to the superior court for proceedings not inconsistent with this opinion.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HAYS and HOLOHAN, JJ., concurring.

---

**5.** The only evidence introduced at the first trial which can be said was illegally obtained is the "crabs" and "no explanation" statements. Of course, any testimony impelled by the use of these statements should be excluded at the retrial on the basis of *Harrison.*